# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA    )
        )
        v.    )   Misc. Nos.   06-123
        )             06-124
I. LEWIS LIBBY,    )             06-125
    also known as "Scooter Libby"   )             06-126
        )             06-128
        )             06-169

## I. LEWIS LIBBY'S CONSOLIDATED RESPONSE TO MOTIONS TO QUASH BY NBC NEWS, JUDITH MILLER, ANDREA MITCHELL, MATTHEW COOPER, TIME INC., AND *THE NEW YORK TIMES*, AND MEMORANDUM OF LAW IN SUPPORT

Theodore V. Wells, Jr.
D.C. Bar No. 468934
James L. Brochin
D.C. Bar No. 455456
Paul, Weiss, Rifkind, Wharton
  & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3089

Joseph A. Tate
Dechert LLP
2929 Arch Street
Cira Centre
Philadelphia, PA 19104
(215) 994-2000

William H. Jeffress, Jr.
D.C. Bar No. 041152
Alex J. Bourelly
D.C. Bar No. 441422
Alexandra M. Walsh
D.C. Bar No. 490484
Baker Botts LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 639-7751

John D. Cline
D.C. Bar No. 403824
Jones Day
555 California Street, 26th Floor
San Francisco, CA 94104
(415) 875-5812

May 1, 2006

## TABLE OF CONTENTS

**INTRODUCTION**.................................................................................................. 1

**ARGUMENT** .......................................................................................................... 2

I.     MR. LIBBY'S SUBPOENAS SATISFY THE STANDARDS
      GOVERNING RULE 17(C) SUBPOENAS ......................................................... 3

     A.    The Movants Misstate The Showing That Is Required
          Under *Nixon* ...................................................................................... 3

     B.    Mr. Libby's Subpoenas Seek, With The Requisite
          Specificity, Admissible Evidence That He May Use In His
          Defense At Trial .................................................................................. 6

II.    TO PROTECT HIS CONSTITUTIONAL RIGHT TO A FAIR
      TRIAL, EACH OF MR. LIBBY'S SUBPOENAS SHOULD BE
      PROMPTLY ENFORCED. ................................................................................ 10

     A.    Mr. Libby's Subpoena To Judith Miller .................................................. 10

     B.    Mr. Libby's Subpoena To *The New York Times* ....................................... 15

     C.    Mr. Libby's Subpoenas To NBC News And Andrea Mitchell ................. 24

     D.    Mr. Libby's Subpoenas To *Time* Inc. And Matthew Cooper. .................. 31

III.   THE MOVANTS ENJOY NO PRIVILEGE, UNDER THE
      CONSTITUTION OR THE COMMON LAW, TO DEPRIVE
      MR. LIBBY OF THE EVIDENCE HE SEEKS .................................................. 37

     A.    The First Amendment Does Not Permit Reporters Or News
          Organizations To Withhold From A Criminal Defendant
          Evidence Relevant To The Charges Against Him. ................................... 37

     B.    This Court Should Not Recognize A New Reporters' Privilege
          Under The Federal Common Law. .......................................................... 41

     C.    Even If There Were A Reporters' Privilege It Would Be Qualified
          And Easily Overcome By The Circumstances Of This Case. .................. 44

**CONCLUSION** ...................................................................................................... 45

## TABLE OF AUTHORITIES

### CASES

*Bowman Dairy Co. v. United States*, 341 U.S. 214 (1951) ............................................................1

*\*Branzburg v. Hayes*, 408 U.S. 665 (1972)........................................................................ passim

*Delaney v. Superior Court*, 789 P.2d 934 (Cal. 1990)....................................................42

*Herbert v. Lando*, 441 U.S. 153 (1979) ..........................................................................41

*Hoselton v. Metz Baking Co.*, 48 F.3d 1056 (8th Cir. 1995) ..........................................16

*In re Grand Jury Subpoena*, 829 F.2d 1291 (4th Cir. 1987) ..........................................9

*\*In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141 (D.C. Cir. 2006),
     *modifying* 297 F.3d 964 (D.C. Cir. 2005)............................................................38, 41, 42

*In re Shain*, 978 F.2d 850 (4th Cir. 1992) ......................................................................40

*Jaffee v. Redmond*, 518 U.S. 1 (1996) ............................................................................42

*Lee v. Dept. of Justice*, 401 F. Supp. 2d 123 (D.D.C. 2005) ....................................42, 43

*Malek v. Fed. Ins. Co.*, 994 F.2d 49 (2d Cir. 1993) ........................................................16

*McKevitt v. Pallasch*, 339 F.3d 530 (7th Cir. 2003) ................................................40, 45

*Riley v. City of Chester*, 612 F.2d 708 (3d Cir. 1979) ....................................................41

*United States v. Ahn*, 231 F.3d 26 (D.C. Cir. 2000) ......................................................40

*United States v. Brooks*, 966 F.2d 1500 (D.C. Cir. 1992) ..............................................8

*United States v. Burke*, 700 F.2d 70 (2d Cir. 1983)........................................................40

*United States v. Caruso*, 948 F. Supp. 382 (D.N.J. 1996) ............................................10

*United States v. Cherry*, 876 F. Supp. 547 (S.D.N.Y. 1995) ..........................................8

*United States v. Cuthbertson*, 630 F.2d 139 (3rd Cir. 1980) ..........................................8

*United States v. Cuthbertson*, 651 F.2d 189 (3rd Cir. 1981) ..........................................8

*United States v. Cutler*, 6 F.3d 67 (2d Cir. 1993) ....................................................17, 40

*United States v. Denton*, 146 Fed. Appx. 888 (9th Cir. 2005).........................................16

*United States v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976)...............................................5

*United States v. Hall*, 419 F.3d 980 (9th Cir. 2005).......................................................16

*United States v. Hubbard*, 493 F. Supp. 202 (D.D.C. 1979).....................................40, 43

*United States v. Hughes*, 895 F.2d 1135 (6th Cir. 1990)..................................................8

*United States v. Jackson*, 155 F.R.D. 664 (D. Kan. 1994)..............................................9

*United States v. King*, 194 F.R.D. 569 (E.D. Va. 2000)...............................................5, 8

*United States v. Kingston*, 971 F.2d 481 (10th Cir. 1992)............................................16

*United States v. LaRouche Campaign*, 841 F.2d 1176 (1st Cir. 1988)................. passim

*United States v. Liddy*, 354 F. Supp. 208 (D.D.C. 1972)..................................... passim

*United States v. Modi*, 2002 WL 188327 (W.D. Va. Feb. 6, 2002)...............................10

*United States v. Morris*, 287 F.3d 985 (10th Cir. 2002)...............................................10

*United States v. Nixon*, 418 U.S. 683 (1974)..................................................... passim

*United States v. Noriega*, 764 F. Supp. 1480 (S.D. Fla. 1991).......................................5

*United States v. Orena*, 883 F. Supp. 849 (E.D.N.Y. 1995)...........................................5

*United States v. Poindexter*, 725 F. Supp. 13 (D.D.C. 1989).........................................5

*United States v. Poindexter*, 727 F. Supp. 1501 (D.D.C. 1989).....................................5

*United States v. Smith*, 135 F.3d 963 (5th Cir. 1998)......................................17, 40, 41

*United States v. Zandford*, 110 F.3d 62 (4th Cir. 1997)...............................................16

*Univ. of Penn. v. EEOC*, 493 U.S. 182 (1990).......................................................42, 43

*Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981)...............................................40, 41, 43

## FEDERAL RULES OF EVIDENCE

Fed. R. Evid. 401 ...................................................................................................................8

Fed. R. Evid. 803(6)..............................................................................................................16

## INTRODUCTION

The central value of our criminal justice system is the defendant's right to a fair trial—one in which the government's case can be rigorously challenged and the defense fully presented. *See United States v. Nixon*, 418 U.S. 683, 709 (1974). As the Supreme Court has recognized, "[t]he ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts." *Id.* To that end, the Constitution affords criminal defendants the right to obtain evidence and, where necessary, to compel its production. *Id.* at 711. To protect that right, Rule 17(c) authorizes defendants to subpoena documents from third parties and, where appropriate, to obtain those documents in advance of trial. *See Bowman Dairy Co. v. United States*, 341 U.S. 214, 219-20 (1951). A trial court's power to enforce such subpoenas is a "fundamental instrument of justice" in a criminal case. *United States v. Liddy*, 354 F. Supp. 208, 211 (D.D.C. 1972).

The indictment in this case charges Mr. Libby with perjury, false statements, and obstruction of justice based on conversations he had with three reporters in the summer of 2003. To obtain that indictment, the Special Counsel used the grand jury's subpoena power to compel testimony and procure documents from a number of reporters and news organizations. Mr. Libby now faces a criminal trial in which that evidence will be used against him. Accordingly, he has issued his own subpoenas to obtain from those same reporters and news organizations evidence that the Special Counsel did not obtain, and that Mr. Libby will use to attack the government's case and prove his innocence at trial. Among other things, the documents sought will help to show whether it is Mr. Libby or the reporters who have misstated or misrecollected the facts. Such evidence obviously goes to the heart of this case.

1

Judith Miller, *The New York Times*, Andrea Mitchell, NBC News, Matthew Cooper, and *Time* Magazine ("Movants") have all moved to quash Mr. Libby's subpoenas.[1] They assert that Mr. Libby has not satisfied the criteria set forth in *United States v. Nixon*, *supra*, which governs the use of third-party subpoenas, and that, even if he has, they enjoy a special "reporters' privilege" to withhold from Mr. Libby admissible evidence relevant to his defense. They are wrong. As set forth below, Mr. Libby's subpoenas easily satisfy the standards established by *Nixon*. And, contrary to their claim, the Movants have no right—under the Constitution or the common law—to deprive Mr. Libby of evidence that will help establish his innocence at trial. The Court should deny the motions to quash and order the Movants promptly to comply.

Section I of this Memorandum corrects the Movants' mischaracterizations of the legal authority governing Rule 17(c) subpoenas and shows why, as a general matter, Mr. Libby's subpoenas satisfy the standards set forth in *Nixon*. Section II explains in detail how the subpoenas served on Ms. Miller, *The New York Times*, NBC and Andrea Mitchell, and *Time* and Matthew Cooper seek relevant, admissible, specific evidence critical to defending Mr. Libby's innocence. Section III makes clear why documents sought from the reporters and news organizations are not protected by a reporters' privilege arising under either the Constitution or the federal common law.

---

[1] Mr. Libby also issued subpoenas duces tecum to Tim Russert, CNN and the *Washington Post*. Mr. Russert and CNN responded that they possess no responsive documents. *See* Exhs. A and B. The *Washington Post* responded that it has no responsive documents except for the complete memorandum of the interview of Mr. Libby by Robert Woodward on June 27, 2003, which it has produced to Mr. Libby. *See* Exh. C. Based upon these representations, the defense considers those subpoenas to be satisfied. Mr. Libby chose not to require the *Washington Post* to produce documents it has previously furnished to the government, but which the Court has ruled do not have to be disclosed to the defense.

# ARGUMENT

## I. MR. LIBBY'S SUBPOENAS SATISFY THE STANDARDS GOVERNING RULE 17(C) SUBPOENAS

In *United States v. Nixon*, the Supreme Court held that if a party's subpoena meets three criteria—relevance, admissibility and specificity—that subpoena should be enforced. 418 U.S. at 700; *see id* at 698 ("A subpoena for documents may be quashed if their production would be unreasonable or oppressive *but not otherwise*") (emphasis added). Each of Mr. Libby's subpoenas satisfies those criteria. They are narrowly drawn, good faith efforts to obtain from the Movants documents that Mr. Libby knows or has reason to believe exist and that he can admit in his defense. Mr. Libby needs access to those documents now so that he may properly prepare his defense, and avoid delay at trial. *See Nixon*, 418 U.S. at 699-700.

### A.    The Movants Misstate The Showing That Is Required Under *Nixon*

The Movants' effort to quash Mr. Libby's subpoenas is based on an incorrect and overly strict interpretation of the law. On their view, to obtain enforcement of a subpoena, a party must identify with particularity the exact documents he seeks, describe the precise content they contain, and establish with certainty that they will be admissible at trial. That is incorrect. Indeed, if the standard were set that high, a party would rarely (if ever) be entitled to third-party documentary evidence in advance of trial, and the purposes underlying Rule 17(c) would be undercut entirely.

*Nixon* itself makes clear that the law imposes no such burden. In that case, the government subpoenaed for use at trial tape recordings and documents relating to conversations between the President and certain aides and advisors. The Court upheld the subpoena—notwithstanding the government's inability to "describe[] fully" the contents of the materials, or to say with certainty that they contained admissible evidence. Rather, the Court held that it is

3

adequate to show "a sufficient *likelihood*" that the documents contain material "relevant to the offenses charged in the indictment," and to make a "sufficient *preliminary* showing" that the material sought "contains evidence admissible" at trial. 418 U.S. at 700 (emphasis added). The Court acknowledged that it would be impossible for a party—in advance of actually receiving the documents—to say precisely what evidentiary value they might have. *See id.* It also recognized that a party cannot necessarily pinpoint, before a trial begins, the exact basis on which a document may be admitted. *See id.* at 702 (enforcing the subpoena because there were "valid *potential* evidentiary uses" for the material sought) (emphasis added). Therefore, the Court held that a subpoena can be enforced based on "rational inference[s]"—drawn from the information available at the time—that the evidence sought would "relate to the offenses charged in the indictment" and could likely be admitted at trial. *Id.* at 700.

*Nixon* also made clear that it is perfectly permissible for a court to grant access to potential impeachment evidence before a trial begins. The Court recognized that, although "the need for evidence to impeach witnesses" might not "*generally*" be sufficient to require pre-trial production, this rule is not absolute and must yield where circumstances require it. In *Nixon*, the Court concluded that "the analysis and possible transcription of the tapes [at issue] may take a significant period of time," and that it therefore was well within the district court's discretion to order pre-trial return. Doing so would ensure that the government could "properly prepare" its case and prevent unreasonable delay at trial. *See id.* at 699, 701-02. As shown below, the same circumstances are present in this case.

Lower courts have remained faithful to the Supreme Court's teachings when considering pre-trial subpoenas issued by criminal defendants. They have applied *Nixon*'s "sufficient likelihood" standard in considering a document's potential relevance. *See, e.g.*, *United States v.*

4

*LaRouche Campaign*, 841 F.2d 1176, 1180 (1st Cir. 1988) (circumstantial evidence "supports the district court's finding of [a] *likelihood* that the outtakes would reveal inconsistent statements and bias") (emphasis added); *United States v. Poindexter*, 725 F. Supp. 13, 30 (D.D.C. 1989). And they have rejected a benchmark of "exquisite specificity" that would require a defendant to identify with particularity each of the documents sought and what specific evidence those documents contain, *see United States v. Poindexter,* 727 F. Supp. 1501, 1510 (D.D.C. 1989); *United States v. Haldeman*, 559 F.2d 31, 76 n.92 (D.C. Cir. 1976) ("Now, if a paper be in possession of the opposite party, what statement of its contents or applicability can be expected from the person who claims its production, he not precisely knowing its contents?") (citation and internal quotation marks omitted). Rather, under the law, it is sufficient for a defendant to explain what he "reasonably . . . believe[s] to be contained in the documents sought," and why that material may be relevant to his defense. *See United States v. Noriega*, 764 F. Supp. 1480 (S.D. Fla. 1991).

    Courts also do not require defendants to establish with certainty that a document will be admissible before trial begins—recognizing that it would be almost impossible to do so. *See United States v. Orena*, 883 F. Supp. 849, 868 (E.D.N.Y. 1995). Rather, it is sufficient that the documents are "at least potentially admissible" or might "form the basis for eliciting certain testimony at trial." *Id.* (enforcing subpoena because documents might be used as, *e.g.*, recorded recollections). What is more, consistent with *Nixon*, courts often enforce subpoenas seeking documents with potential impeachment value—particularly where, as in Mr. Libby's case, the evidence relates to individuals who are virtually certain to testify and there is a clear indication of what they will say. *See, e.g., LaRouche Campaign,* 841 F.2d at 1180; *United States v. King*, 194 F.R.D. 569, 574 (E.D. Va. 2000); *Liddy*, 354 F. Supp. at 215 (granting pre-trial "access to

materials which contain prior statements of the witness, statements that *possibly might be admissible* into evidence to discredit or impeach that witness") (emphasis added). Indeed, "[i]f impeachment evidence is available, it is critical that the defendants have access to it," *id.* at 215, and well within a trial court's discretion to order such access in advance of trial, *see Nixon*, 418 U.S. at 702; *LaRouche*, 841 F.2d at 1180.

### B.   Mr. Libby's Subpoenas Seek, With The Requisite Specificity, Admissible Evidence That He May Use In His Defense At Trial

In Section II, we provide a detailed analysis of why each of Mr. Libby's subpoenas satisfy the criteria set forth in *Nixon*. Here, we provide a general statement of why that is so.

*First*, Mr. Libby has established a "sufficient likelihood" that the documents he seeks are relevant to his defense. The indictment charges Mr. Libby with lying to the FBI and the grand jury about portions of conversations he had with Ms. Miller, Mr. Russert, and Mr. Cooper in July 2003. As explained below, the documents sought are likely to contain evidence that some, if not all, of his testimony about those conversations was correct and that it is the reporters who have an unreliable recollection or have misstated the facts. The indictment also alleges that Mr. Libby had conversations with several government officials about Ms. Wilson throughout June and early July 2003. *See* Count 1, ¶¶ 6-9, 11, 14, 16-19, 21. The government will rely on those conversations to contend that Mr. Libby must have been lying when he testified that he was surprised to learn from Mr. Russert (on July 10 or 11) that Ms. Wilson worked for the CIA, and when he said that he told Mr. Cooper and Ms. Miller (on July 12) that he did not know if that fact was true. As detailed below, the documents sought likely contain evidence that the government's witnesses are mistaken about those alleged conversations, or are shading their testimony to protect themselves or others.

The documents sought also likely contain evidence that the employment status of the former ambassador's wife was not something Mr. Libby or others in the administration cared much about.  Documents of that kind help to show that Ms. Wilson was so peripheral in Mr. Libby's mind that he could have easily forgotten or misremembered any conversation in which she was allegedly discussed.  Such documents are also relevant because, according to a recent filing, the government believes—and may attempt to show at trial—that Mr. Libby and other White House officials conducted "concerted" efforts to discredit or punish Mr. Wilson by disclosing his wife's CIA identity.  *See* Govt.'s Resp. to Def.'s Third Mot. to Compel Disc. at 29-30 & n.10. Documents showing that Mr. Libby and other officials talked to reporters about Mr. Wilson during this time but never mentioned his wife will help to show that there was no such campaign—or that if there was, Mr. Libby had nothing to do with it.   The Movants admit that they have such documents but refuse to turn them over.

Relatedly, some of the Movants contend that Mr. Libby is not entitled to documents showing that its employees knew or may have known about Ms. Wilson's CIA status before Mr. Novak's column.  In fact, evidence that Ms. Wilson's CIA affiliation was known outside the intelligence community is critical to the defense.  It is contrary to what is alleged in the indictment, *see* Count One, ¶ 1(f), and it corroborates that Mr. Libby had no reason to know or even suspect that Ms. Wilson's employment status was classified—and therefore had no reason to lie about what information he shared with reporters about that fact.  *See* Tr. of Oral Argument, at 84 (Feb. 24, 2006) (the government "will argue that [Mr. Libby] knew or should have known [Ms. Wilson's employment status] was classified").

***Second***, Mr. Libby has more than satisfied the "preliminary showing" of admissibility required by *Nixon*.  As shown below, many of his requests seek substantive evidence admissible

7

to show that the existence of certain facts "of consequence to the determination of the [charges against him are] more or less probable." *See* Fed. R. Evid. 401.

To the extent Mr. Libby's requests encompass impeachment material, he should be given that evidence in advance of trial so that he may review, analyze, and incorporate it into his defense strategy. *See Fryer v. United States*, 207 F.2d 134, 136 (D.C. Cir. 1953) (pre-trial production of potential impeachment material "leads to the fullest presentation of the facts and away from the notion of a trial as a game of combat by surprise").

The cases relied on by the Movants do not compel a different result. Consistent with *Nixon*, those cases recognize only a "*general*" presumption against pre-trial production of impeachment evidence. *See, e.g., United States v. Cuthbertson*, 630 F.2d 139, 144-45 (3rd Cir. 1980); *United States v. Cuthbertson*, 651 F.2d 189, 192 (3rd Cir. 1981); *United States v. Hughes*, 895 F.2d 1135, 1146 (6th Cir. 1990); *United States v. Cherry*, 876 F. Supp. 547, 553 (S.D.N.Y. 1995). And the Movants cite no case from *this* circuit that imposes a *per se* rule. Indeed, such a rule would run counter to the "chief innovation" of Rule 17(c)—namely, "to expedite trial by providing a time and a place *before* trial for the inspection of subpoenaed materials." *Nixon*, 418 U.S. at 689-99 (emphasis added). Instead, it is well-recognized that the decision to order the production of documents in advance of trial—including those containing impeachment material—is a discretionary one that should turn on the facts and circumstances of the case. *See id.* at 702; *United States v. Brooks*, 966 F.2d 1500, 1505 (D.C. Cir. 1992); *King*, 194 F.R.D. at 574 n.5.

Here, the facts and circumstances plainly warrant pre-trial production. Mr. Libby's subpoenas target material relating to a limited number of individuals (including Ms. Miller, Mr. Russert, and Mr. Cooper), who are virtually certain to testify in this case. The indictment and (in

8

some cases) the witnesses' own public statements, give a clear indication of what they will say. Under those circumstances, it would make little sense to deprive Mr. Libby of pre-trial access to evidence he may use to cast doubt on their testimony. Indeed, past experience in this case teaches that "analysis and possible transcription" of much of the evidence sought (including reporters' notes) "may take a significant period of time." *See Nixon*, 418 U.S. at 702. Furthermore, an order granting Mr. Libby the evidence he seeks will, if resisted by the Movants, trigger protracted appellate proceedings. To avoid delay and ensure Mr. Libby can properly prepare for trial, the Court should order the Movants to turn over potential impeachment material now.

*Finally*, Mr. Libby's subpoenas are sufficiently specific. They are targeted to obtain evidentiary material that, based on the other evidence in this case, Mr. Libby knows or has good reason to believe the Movants possess. To that end, they identify date ranges, probable custodians, particular events, and narrowly circumscribed subject areas.

Still, the Movants insist that Mr. Libby's subpoenas lack the particularity necessary for them to determine what materials he is seeking. But the very fact that they are able to identify specific documents directly responsive to his requests, *see, e.g.*, NYT Mot. at 9, shows that that is not so. *See United States v. Jackson*, 155 F.R.D. 664, 667 (D. Kan. 1994) (requests need only be sufficiently specific so that a party may identify responsive documents and lodge objections on relevance or admissibility grounds); *compare In re Grand Jury Subpoena*, 829 F.2d 1291 (4th Cir. 1987) (quashing subpoena because it required parties to identify "lewd" and "erotic" material, a highly subjective endeavor).

For those reasons, the Movants' reliance on cases like *United States v. Morris*, 287 F.3d 985 (10th Cir. 2002), is entirely misplaced. In that case, the defendant sought "all records,

documents, reports, telephone logs, etc., surrounding the investigation into the FBI undercover agent's shooting of [the defendant] and the agent's entire personnel file." The Tenth Circuit upheld the district court's decision to quash, noting that "requests for an entire file are evidence of an impermissible fishing expedition." *Id.* at 991. Mr. Libby's subpoenas do not seek "entire files" from any reporter or newsroom, or otherwise bear any resemblance to the subpoenas in *Morris*.

*United States v. Modi*, 2002 WL 188327 (W.D. Va. Feb. 6, 2002), is also inapposite. There, defendants requested documents "relating to a series of broad subjects" without articulating any concrete reason for believing that those documents would contain "something useful to their defense." *Id.* at *2. Here, Mr. Libby seeks all documents that fall within circumscribed subject areas relating directly to his defense. Such requests are perfectly permissible. *See, e.g., United States v. Caruso*, 948 F. Supp. 382, 396 (D.N.J. 1996) (enforcing subpoenas seeking "*all* documents" concerning certain policies and practices of defendant's employer) (emphasis added).

## II.    TO PROTECT HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL, EACH OF MR. LIBBY'S SUBPOENAS SHOULD BE PROMPTLY ENFORCED

### A.    Mr. Libby's Subpoena To Judith Miller

As the indictment makes plain, Judith Miller is critical to the government's case against Mr. Libby. The indictment includes allegations about three conversations Ms. Miller had with Mr. Libby in June and July, 2003. It alleges that on June 23, Mr. Libby "informed [Ms. Miller] that Wilson's wife might work at a bureau of the CIA," Count One, ¶ 14; that on July 8, Mr. Libby advised Ms. Miller of his belief that Mr. Wilson's wife worked for the CIA, *id.* ¶ 17; and that on July 12, Mr. Libby spoke with Ms. Miller about Ms. Wilson's CIA employment, *id.* ¶ 24.

Those conversations figure prominently in the charges against Mr. Libby, and Ms. Miller will undoubtedly be a central witness in the government's case-in-chief.

Yet, Ms. Miller's own public account casts serious doubt on the reliability of her recollection. For example, she has written that she testified to the grand jury only that she "*believed* [her June 23 meeting with Mr. Libby] was the first time [she] had been told that Mr. Wilson's wife might work for the CIA." Judith Miller, *A Personal Account; My Four Hours Testifying in the Federal Grand Jury Room*, New York Times, Oct. 16, 2005, at 4 (emphasis added) (Exh. D; hereinafter "*A Personal Account*"). She was even more equivocal with her *New York Times* colleagues, telling them that her notes "*leave open the possibility* that Mr. Libby told her [on June 23 that] Mr. Wilson's wife might work at the agency." Don Van Natta, Jr., Adam Liptak & Clifford J. Levy, *The Miller Case: A Notebook, a Cause, a Jail Cell and a Deal*, New York Times, Oct. 16, 2005, at 4 (emphasis added) (Exh. E; hereinafter "*The Miller Case*"). Notably, Ms. Miller did not remember that the June 23 conversation had even *occurred* until after her first grand jury appearance when she came across a notebook recording the interview. *See* Judith Miller, *Responses to Byron Calame's Questions*, JudithMiller.Org, Nov. 9, 2005 (Exh. F; hereinafter "*Responses to Calame*").

Ms. Miller's recollection of the July 8 conversation is equally sketchy. *See A Personal Account*, at 5 ("I said [to the grand jury] I couldn't be certain whether I had known Ms. Plame's identity before this meeting, and I had no clear memory of the context of our conversation that resulted in th[e] notation [(wife works in Win Pac)]"). The same is true for July 12. For example, when asked by the grand jury whether Mr. Libby had "given [her] the name Wilson," Ms. Miller responded that she "didn't know and didn't want to guess." *Id.* at 7.

11

At trial, Mr. Libby is entitled to contend that Ms. Miller's stated recollection is by no means sufficiently reliable to prove that the conversations occurred as the government alleges. Accordingly, he has subpoenaed from Ms. Miller the unredacted, original notebooks in which those conversations were recorded (*Request 1*); her appointment calendars and telephone logs for the period during which the conversations took place (*Request 2*); documents prepared or received by Ms. Miller prior to July 14, 2003 that refer to Mr. Wilson's wife (*Request 4*); and documents prepared or received by her that purport to describe the conversations (*Request 6*).

Ms. Miller has identified the following specific materials that are responsive to those requests: two original, unredacted notebooks, work-related phone records, and an appointment calendar.[2] *See* Miller Mot. at 3-4. Her motion to quash, however, claims that Mr. Libby is not entitled to those materials because those documents have no relevance or evidentiary value for Mr. Libby's defense. A declaration attached to the motion avers, for example, that the redacted portions of the notebooks reflect conversations with sources other than Mr. Libby about topics that, in counsel's estimation, are unrelated to this case. *See* Miller Mot. Exh. A, Bennett Decl. ¶ 7. While we have no reason to doubt counsel's representations regarding the content of the notebooks, we do take issue with the notion that he is equipped to decide what is and is not relevant to Mr. Libby's defense. Rather, it is Mr. Libby and his counsel who are in the best position to make those important judgments. As shown below, the documents Mr. Libby seeks are powerful evidence that Ms. Miller's recollection may be inaccurate—whether those documents refer directly to Mr. Libby and the Wilsons, or not.

---

[2] Ms. Miller's motion states that at this time she has not located any documents responsive to Mr. Libby's other subpoena requests, but that she has not yet completed her search. *See* Miller Mot. at 3. Mr. Libby assumes that Ms. Miller will complete her search as expeditiously as possible (and not later than May 16) and bring to his and the Court's attention any additional responsive documents she may find.

For example, the highly redacted notebooks provided to Mr. Libby by the government indicate that Ms. Miller was given Mr. Wilson's name and phone number *before* she spoke with Mr. Libby on June 23. Armed with the unredacted page on which that notation appears, Mr. Libby may ask Ms. Miller why and from whom she obtained Mr. Wilson's contact information—and whether she may have learned of Ms. Wilson's CIA affiliation from the same source at the same time, *before* she first spoke with Mr. Libby. Likewise, the redacted version of the notes suggests that Ms. Miller's notation "Victoria Wilson" may have been made *before* her conversation with Mr. Libby on July 12, perhaps based on information received from someone else. Notes on the preceding pages may allow the defense to ask Ms. Miller from whom (other than Mr. Libby) she might have learned that name.

In addition, an entry on the second page of Ms. Miller's notes regarding her June 23 conversation with Mr. Libby reads "(Wife works in bureau?)." An entry on the fourth page, referring to the July 8 interview, contains an entry, also in parentheses, "(wife works in Winpac)." *See A Personal Account,* at 5. Ms. Miller has written that she does not recall the meaning of parentheses in her notes and that she "wasn't sure what [the question mark] meant." *Id.* at 3, 4. The condition of the original pages (*e.g.*, the color of the ink and the weight of the markings) may allow Mr. Libby to ask Ms. Miller whether it is possible that she did not write the parenthetical references to Mr. Wilson's wife when she interviewed Mr. Libby, but added them *later*, based on information she learned from a source other than Mr. Libby. *See The Miller Case*, at 4 (according to Ms. Miller, "her notes *leave open the possibility* that Mr. Libby told her Mr. Wilson's wife might work at the agency"). Mr. Libby is also entitled to information that would enable him to cross-examine Ms. Miller as to the likelihood that her entry and question

13

mark in her June 23 notes represent a question by her or an unspoken thought she had, and not a statement by Mr. Libby.

Ms. Miller's notebooks are also replete with various formulations of Ms. Wilson's name: "Valerie Flame," "Valery Plame," "Valerie P," "V.F.?," and "Victoria Wilson – works in unit." The first such reference, however, is "separated by two pages" from the end of her July 8 interview with Mr. Libby. *See Responses to Calame.* Ms. Miller has publicly stated that she does not believe that information came from Mr. Libby. *A Personal Account*, at 3, 6.

Ms. Miller does not deny that conversations she had with other reporters or other government officials about Ms. Wilson are directly relevant to this case. Nor could she in light of this Court's prior ruling. *See* Mem. Op. at 1 n.3. However, she contends that Mr. Libby is not entitled to her notebooks (or her calendar or her phone records) because this material reflects contacts with persons not "pertinent to this case" and because—according to the declaration of her counsel—they provide no "context" for the references to Ms. Wilson. *See* Miller Mot. at 2, 7. As explained above, Mr. Libby is clearly much better situated than Ms. Miller's counsel to determine which individuals are "pertinent to this case" and what "context" is useful to the defense.[3] Even if Ms. Wilson's name is not mentioned, notes reflecting the identity of other government officials or reporters to whom Ms. Miller spoke and records reflecting when she spoke to them—combined with information already known to the defense—will allow us to

---

[3] Indeed, Ms. Miller's counsel's declaration states only that "[t]he redacted passages in Ms. Miller's notes . . . comprise *to the best of my knowledge* her personal notes and notes of interviews with sources other than Mr. Libby regarding topics unrelated to Mr. Libby, Ms. Plame, or Mr. Wilson" and that "the unattributed references in the notes . . . are *to my knowledge* not tied to any identifiable source." *See* Bennett Decl. ¶ 7 (emphasis added). At the same time, he acknowledges that he has debriefed Ms. Miller only "*about her notes and recollection of her contacts with Mr. Libby.*" *Id.* ¶ 5 (emphasis added). He gives no indication that he spoke with Ms. Miller about any of her conversations reflected in the redacted passages. Given this fact, counsel could not possibly have enough information to decide whether the unredacted portions of the notebooks might provide important evidence for Mr. Libby's defense.

identify who, other than Mr. Libby, may have disclosed Ms. Wilson's CIA affiliation to Ms.

Miller and when those conversations may have occurred—and to ask Ms. Miller about this at

trial.

Such information is undoubtedly important evidence in this case. It will allow Mr. Libby

to contend that, contrary to the allegations in the indictment, it was *Ms. Miller* who raised this

topic in her discussions with Mr. Libby—if the topic was raised at all. It will also support his

claim that Ms. Wilson's CIA identity was widely known at the time and that he did not know or

have reason to believe it was classified information, and therefore had no reason to lie about

what information he had shared with Ms. Miller or others.

**B.      Mr. Libby's Subpoena To *The New York Times***

Ms. Miller worked for *The New York Times* and actively reported for the newspaper

during the period relevant to the indictment. In addition, other *New York Times* employees

(including Nicholas Kristof) investigated and reported on Mr. Wilson, and may have spoken to

Ms. Miller about him and his background during the spring and summer of 2003. More recently,

*The New York Times* undertook an investigation and analysis of the events leading to and

immediately following Ms. Miller's incarceration. That analysis included extensive interviews

of Ms. Miller about her conversations with Mr. Libby, as well as the testimony she eventually

gave to the grand jury. *See The Miller Case*, *supra*. The newspaper published Ms. Miller's own

account of those events on that same day. *See A Personal Account*, *supra*. Based on the

foregoing, it is clear that *The New York Times* likely possesses admissible evidence relevant to

Mr. Libby's defense. His subpoena is narrowly drawn to obtain that evidence.

> **1.      Mr. Libby is entitled to immediate access to documents that describe
> or purport to describe his conversations with Ms. Miller in June and
> July 2003**

As discussed above, Mr. Libby needs and is entitled to all evidence that he may use to show that his conversations with Ms. Miller did not occur as alleged. Accordingly, he has sought from *The New York Times* documents prepared by Ms. Miller or other employees of the newspaper that "refer to or purport to describe" the June 23, July 8, and July 12 conversations (*Request 3*). The newspaper acknowledges that it has such documents, including draft articles, unedited transcripts of interviews with Ms. Miller, and notes made by a reporter of one of those interviews. *See* NYT Mot. at 2, 24, 25 n.9. What is more, it concedes that such evidence will almost certainly be relevant to Mr. Libby's defense at trial. *See id.* at 24-25. Still, the newspaper asserts that it should be allowed to withhold this evidence until *after* Ms. Miller has testified, and *after* the Court has confirmed by *in camera* review that Mr. Libby is entitled to it. *Id.* at 24-27. That proposal should be denied.[4]

As explained above, courts often grant litigants access to impeachment material in advance of trial where (1) a person is almost certain to be a witness at trial, and (2) there is a clear indication of what she is likely to say. *See supra* at 4-5, 7-9. Both of those conditions are present with respect to Ms. Miller. Where "a chief government witness . . . has seen fit to give a lengthy and apparently comprehensive first person narrative account to newspaper reporters of the activities [s]he will testify about at trial," it would defy reason to deprive the defendant

---

[4] The newspaper claims that Mr. Libby is *never* entitled to receive notes of interviews with Ms. Miller that do not contain her verbatim or substantially verbatim statements since that material constitutes inadmissible hearsay. *See* NYT Mot. at 25 n.9. But courts routinely allow contemporaneous notes taken by professionals in the regular course of business to be admitted under the business records exception. *See* Fed. R. Evid. 803(6). That is so even where the notes do not purport to be verbatim recordings of what was said. *See, e.g.*, *United States v. Denton*, 146 Fed. Appx. 888, 891 (9th Cir. 2005) (psychoanalyst); *United States v. Hall*, 419 F.3d 980, 987 (9th Cir. 2005) (probation officer); *United States v. Zandford*, 110 F.3d 62 (4th Cir. 1997) (unpublished) (nurse); *Hoselton v. Metz Baking Co.*, 48 F.3d 1056, 1061 (8th Cir. 1995) (accountant); *Malek v. Fed. Ins. Co.*, 994 F.2d 49, 53 (2d Cir. 1993) (social worker); *United States v. Kingston*, 971 F.2d 481, 486 (10th Cir. 1992) (loan counselor). There is no reason this same rule should not apply to reporters, who have an equal incentive for accuracy.

access to that information until after the trial is underway. *Liddy*, 354 F. Supp. at 216. The last

thing the Court and the parties should want in this case is to delay a dispute over such evidence

until the middle of trial. The Court should order *The New York Times* to provide Mr. Libby the

documents he seeks now so that he may properly prepare his defense, and so that any appellate

proceedings the newspaper may want to pursue are completed in advance of the trial.

What is more, we respectfully submit that *in camera* review of those documents would be

an unnecessary use of the Court's resources in this case. Evidence of what Ms. Miller has said

about her conversations with Mr. Libby will almost certainly constitute admissible evidence. *See*

*United States v. Smith*, 135 F.3d 963, 972 (5th Cir. 1998) (indicating that pre-production *in*

*camera* review was not necessary since government's response to motion to quash, on its face,

demonstrated that the evidence sought satisfied *Nixon*); *United States v. Cutler*, 6 F.3d 67, 74

(2d. 1993) (district court did not abuse discretion by declining to review *in camera* "[g]iven the

clear relevance of the [material sought] to the defense"). Nor is the Court in as good a position

as Mr. Libby and his counsel are to detect how particular material in the documents (*e.g.*, entries

in reporters' notes) are relevant to the defense. Finally, as explained below, there is no privilege

that needs to be protected here. Under these circumstances, the Court need not devote its limited

resources to this task. *See* 135 F.3d at 972.

>    **2.    Mr. Libby needs and is entitled to evidence regarding**
>    **communications about Mr. Wilson between reporters and certain**
>    **individuals critical to this case**

Mr. Libby also seeks from *The New York Times* documents reflecting communications

concerning Mr. Wilson between the newspaper's employees and certain current and former

government officials (*Request 6*). Several of those persons have been identified as witnesses for

the government. *See* Govt.'s Resp. to Def.'s Third Mot. to Compel Disc. at 9. Others may be

called by Mr. Libby himself. All are central figures in this case. *The New York Times* has

17

documents responsive to this request, but claims that they are irrelevant and inadmissible because they "contain no information" about Mr. Libby, Ms. Wilson, or Ms. Wilson's employment. That argument misunderstands what is at issue in this case.

As explained above, the government has indicated that it believes—and may attempt to show at trial—that Mr. Libby lied about his conversations with reporters in July 2003 to conceal the fact that he and other administration officials had engaged in a "vigorous effort" to attack Mr. Wilson and undermine his credibility by outing his wife. *See id.* at 18-19, 20, 26. Mr. Libby can rebut this theory by showing that his conversations with reporters about Mr. Wilson and his trip were necessitated by, and focused upon, the false information being spread by Mr. Wilson, and were not focused upon Mr. Wilson's wife. In that regard, he may seek to elicit testimony from other administration officials—including, for example, his subordinates in the Office of the Vice President (OVP)—to testify that they too were intent on rebutting Mr. Wilson's criticism *on the merits*; that they saw his wife's CIA affiliation as a peripheral issue (at most); and that they were never instructed by Mr. Libby to disseminate information regarding Ms. Wilson's CIA affiliation to the press.

The documents sought from *The New York Times* are directly relevant to that defense. Indeed, by the newspaper's own admission, the documents they have reflect conversations with the individuals listed but "contain no information whatsoever regarding . . . the employment of Mr. Wilson's spouse by the CIA." NYT Mot. at 9. Such documents help to show that administration officials—employed by the CIA, the State Department, and the White House (including the OVP)—saw Ms. Wilson's employment as a point unworthy of mention in connection with Mr. Wilson's story. That makes it more likely that Mr. Libby saw Ms. Wilson's