CIA affiliation as a sidelight as well—and could have easily forgotten, months later, about conversations in which the topic was raised.[5]

Documents responsive to this request may also be used to impeach key government witnesses. For example, the indictment alleges that Mr. Libby told former White House Press Secretary Ari Fleischer about Mr. Wilson's wife on July 7, 2003. Count One, ¶ 16. The government will use that alleged conversation to contend that Mr. Libby could not have forgotten that he knew about her by the time he spoke with Mr. Russert on July 10 or 11. However, as we have previously explained, Mr. Fleischer himself may have been a subject of the Special Counsel's investigation and therefore may have a reason to shade his testimony. The press has reported that Mr. Fleischer reviewed a State Department report concerning Mr. Wilson's trip sometime during the July 7-11, 2003 visit by the President to Africa; that the report may have contained classified information; and that Mr. Fleischer may have shared details from the report with numerous reporters. *See, e.g.*, Barton Gellman, *A Leak, Then a Deluge*, Washington Post, Oct. 30, 2005, at A01 (Exh. G); *Special Prosecutor's Probe Centers on Rove, Memo, Phone Calls*, Bloomberg.com, July 18, 2005 ("Fleischer was seen perusing the State Department memo on Wilson and his wife, according to a former administration official who was also on the trip") (Exh. H). One report states:

> [O]n a long Bush trip to Africa, Fleischer and Bartlett prompted clusters of reporters to look into the bureaucratic origins of the Wilson trip. How did the spin doctors know to cast that lure? One possible explanation: some aides may

---

[5] Documents already produced to the defense show that Cathie Martin (Assistant to the Vice President for Public Affairs) was in frequent contact with reporters (including Matthew Cooper of *Time*) during the period that she allegedly learned that Ms. Wilson worked at the CIA. Evidence that Ms. Martin did *not* relay that information to reporters is relevant for the reasons given above. At the same time, evidence suggesting that reporters *may* have learned information about Ms. Wilson from Ms. Martin would also be relevant because, for example, reporters may have associated that information with Mr. Libby (her superior).

have read the State Department intel memo, which Powell had brought with him aboard Air Force One.

Howard Fineman, *Rove at War*, Newsweek, July 25, 2005 (Exh. I); *see also* John Dickerson, *Where's My Subpoena?*, Slate.com, Feb. 7, 2006 (Exh. J). Numerous reporters, including *New York Times* reporter Richard Stevenson, were on the trip and may have received Mr. Fleischer's "prompt." *See* Richard Stevenson, *Bush Has Praise for Uganda in Its Fight Against AIDS*, New York Times, July 12, 2003 (Exh. K). Mr. Libby is entitled to any documents in the possession of *The New York Times* that show Mr. Fleischer encouraged its reporters to seek more information about Mr. Wilson. Mr. Libby may use these documents to cross-examine Mr. Fleischer about whether he may have shared additional—possibly classified—information with other reporters before, during, or after that trip.

Marc Grossman will also be a key government witness. He is expected, for example, to testify that on June 11 or 12, 2003 he told Mr. Libby that "Wilson's wife worked at the CIA and that State Department personnel were saying that Wilson's wife was involved in the planning of his trip." Count One, ¶ 6. Again, the government will presumably rely on this alleged communication to contend that Mr. Libby could not have been surprised when Mr. Russert told him the same thing a month later. Previously we have argued that Mr. Grossman may have a motive to misrepresent the facts. *See* Deft's Third Mot. to Compel at 23. It is also possible that Mr. Grossman is biased against Mr. Libby. A recent online column speculates that Mr. Grossman testified before the grand jury that the disclosure of Ms. Wilson's name was an "act of revenge." *See* Jason Leopold, *Libby Filing*, Truthout.com, Apr. 14, 2006 (Exh. L). The same piece hypothesizes that Mr. Grossman may have been the official who told the *Washington Post* that "two top White House officials" called "at least six Washington journalists and disclosed the identity and occupation of Wilson's wife," and that they did so "'purely and simply for

revenge.'" *See* Michael Allen & Dana Priest, *Bush Administration Is Focus of Inquiry*, Washington Post, Sept. 28, 2003, at A01 (Exh M). Documents showing that Mr. Grossman contacted reporters during this time about Mr. Wilson's trip and his criticism of the administration would be powerful evidence that Mr. Grossman is a biased witness.

*The New York Times* claims that Mr. Libby is not entitled to evidence regarding the individuals listed in this request because "[i]t is unknown at this time whether the eight listed individuals are expected to testify for the government" in his trial. NYT Mot. at 11, 12. In fact, as just explained, the indictment makes clear that the testimony of Mr. Fleischer and Mr. Grossman will feature prominently in the government's case-in-chief. *See* Govt.'s Resp. to Def.'s Third Mot. to Compel Disc. at 11. For that reason, and because their critical testimony is already known, there is no reason not to give Mr. Libby potential impeachment material now.

Other persons named in *Request 6* are also likely to be key witnesses, whether called by the prosecution or the defense. For example, Bill Harlow, the CIA public affairs officer, spoke with both Ms. Wilson and Robert Novak, and likely others, about the disclosure of Ms. Wilson's CIA employment. According to Mr. Novak, Mr. Harlow "denied that Wilson's wife had inspired his selection but said she was delegated to request his help"—a statement which all but confirms that Ms. Wilson worked at the CIA. Robert Novak, *The CIA Leak*, Townhall.com, Oct. 1, 2003 (Exh. N); *Ex-CIA Official's Remark Is Wrong*, Chicago Sun-Times, Aug. 1, 2005 (Exh. O) (identifying Mr. Harlow as the CIA official with whom Mr. Novak spoke about issues related to the Wilsons); *cf.* Joseph Wilson, *The Politics of Truth* 346 (2005) (Exh. P) (Ms. Wilson contacted the CIA "press liaison" after Mr. Wilson talked with Mr. Novak). Mr. Harlow has stated that he provided Mr. Novak with as much information as he was permitted to provide, which raises the possible question whether Mr. Tenet or Mr. Grenier was involved in deciding

what information about Ms. Wilson should and should not be disclosed. *See* Walter Pincus &
Jim VandeHei, *Prosecutor in CIA Leak Case Casting a Wide Net*, Washington Post, July 27,
2005, at A01 (Exh Q).

The foregoing does not exhaust the potential evidentiary value of documents relating to
the key witnesses sought in *Request 6*. But it makes clear that, given the complex factual nature
of this case, Mr. Libby should be given those documents sufficiently in advance of trial so that
he may analyze them and integrate this evidence into his defense.

### 3. The remainder of Mr. Libby's subpoena also seeks specifically defined, admissible evidence that is directly relevant to his defense

With respect to Requests 1, 2, 4 and 5 of Mr. Libby's subpoena, *The New York Times*
broadly claims that the evidence sought is irrelevant, inadmissible, or insufficiently specified.
The newspaper is wrong.

In *Requests 1 and 2* Mr. Libby seeks documents, within a specified date range, that refer
to Ms. Wilson or demonstrate that employees of the newspaper could have been aware of her
CIA employment.[6] Such documents have obvious evidentiary value in this case. Among other
things, Mr. Libby may use them to question Ms. Miller's *New York Times* colleagues about what
they may have known about Ms. Wilson and whether they may have shared that information
with Ms. Miller *prior* to her conversations with Mr. Libby on June 23 or July 8. That, in turn,
would make it more likely that it was Ms. Miller, and not Mr. Libby, who raised this topic during
their initial conversations—or, alternately, that it was never raised at all. Those potential defense
theories are supported by Ms. Miller's notes and directly undercut the government's theory that

---

[6] *The New York Times* casts Mr. Libby's first request as overbroad, claiming that it would
encompass even the Wilsons' engagement or wedding announcement. NYT Mot. at 7.
Subsequent to issuance of the subpoena, however, counsel for Mr. Libby informed George
Freeman, general counsel for *The New York Times*, that Requests 1 and 2 are limited to
documents from on or after January 1, 2003. Because the Wilsons were married in sometime in
1998, an announcement of that event need not be produced.

Ms. Wilson's employment was of great interest to Mr. Libby, and that he therefore could not have forgotten about it by the time he spoke with Mr. Russert on July 10 or 11. *See supra* at 12-14.

The *New York Times* claims that the documents sought should not be provided because "the reporters and sources whose communications are revealed" will "almost certainly never be called as witnesses." *See* NYT Mot. at 4. This Court should not, however, rely on the newspaper's speculation about who may or may not testify at trial. To date there are at least three *New York Times* reporters known to the defense who have relevant testimony: Ms. Miller, Nicholas Kristof (whose May 6, 2003 column made false statements about Mr. Wilson's trip, obviously based on what Mr. Wilson reported), and David Sanger (who interviewed Mr. Libby on July 2, 2003 concerning the 16-words controversy). Whether "sources" will be called depends, of course, upon who those sources are and what they may have said. For example, for reasons discussed above, evidence that Mr. Fleischer, Mr. Harlow, Mr. Grossman or Ms. Martin spoke with *New York Times* reporters about Mr. Wilson and related issues would be highly relevant to the defense.

*Request 4* seeks documents relating to whether Ms. Miller recommended that *The New York Times* pursue a news story or investigation on Mr. Wilson's "trip to Niger or his claims concerning that trip." According to Ms. Miller's public account, she believed that Ms. Wilson's "connection to the CIA [was] potentially newsworthy" and, after her July 8 meeting with Mr. Libby, recommended that the paper "pursue a story," or at least investigate whether Mr. Libby was engaged in "a potential smear of a whistleblower." *A Personal Account*, at 7; *see* Judith Miller, *Letter to Maureen Dowd*, JudithMiller.Org, Nov. 9, 2005 (Exh. R). Jill Abramson, the newspaper's Washington bureau chief, says that this never occurred. *The Miller Case*, at 5.

Contrary to the newspaper's claim, evidence related to this dispute is clearly relevant to the defense. For one thing, evidence showing that Ms. Miller never, in fact, made the request goes to her faulty recollection and/or credibility. For the reasons described above, Mr. Libby is entitled to such potential impeachment evidence now. What is more, such documents support the defense's theory that Mr. Libby did *not* mention Ms. Wilson's CIA affiliation to Ms. Miller—or at least did not use this information to try to discredit or punish Ms. Wilson's husband. That evidence will directly undercut the notion that Mr. Libby was engaged in an improper "smear" campaign and lied to the grand jury and the FBI to conceal it.

*Request 5* seeks documents relating to Ms. Miller's conversation with George Freeman, as reported by Marie Brenner in the recent *Vanity Fair* article, "Lies and Consequences." (Exh. S). According to that article, Ms. Miller approached Mr. Freeman, in-house counsel to the *Times*, after the Special Counsel launched his investigation and said, "I knew Valerie Plame's name. I knew who she was. *I talked to many people in the government about her [before and after] Novak's article.*" *See* Marie Brenner, *Lies and Consequences*, Vanity Fair, Apr. 2006, at 7 (emphasis added). Documents relating to this conversation will be powerful evidence in Mr. Libby's defense. These documents may, for example, identify the government officials to whom Ms. Miller spoke about Ms. Wilson and when those conversations occurred—information Ms. Miller claims she has now forgotten. Again, this is critical evidence that the defense may use to show that Ms. Miller did not learn about Ms. Wilson from Mr. Libby and that, in fact, they may never have discussed Ms. Wilson at all on June 23 or July 8.

### C.     Mr. Libby's Subpoenas To NBC News And Andrea Mitchell

Like Judith Miller, Tim Russert of NBC News ("NBC") is central to the charges against Mr. Libby, and will presumably serve as one of the government's key witnesses in this case. According to the indictment, Mr. Libby lied to the FBI and the grand jury about a conversation

he had with Mr. Russert on July 10 or 11, 2003. Mr. Libby testified that during that conversation Mr. Russert asked Mr. Libby if he was aware that Mr. Wilson's wife worked for the CIA, and told Mr. Libby that all the reporters knew it. *E.g.*, Indictment, Count One, ¶ 26.a. In fact, according to the indictment, Mr. Libby and Mr. Russert did not discuss Mr. Wilson's wife at all. *Id.*, ¶ 20.

Andrea Mitchell, Mr. Russert's subordinate at NBC, may also play a pivotal role at trial. Ms. Mitchell is the Chief Foreign Affairs Correspondent for NBC, and at the time of the indictment was an active reporter on foreign policy and intelligence issues, including the administration's decision to go to war in Iraq. She is known as an "access reporter" who has well-developed contacts in numerous government agencies, including the CIA and the Department of State. On July 6, 2003, she substituted for Mr. Russert as host of the NBC program *Meet the Press* and interviewed Mr. Wilson about his revelation that he was the unnamed envoy to Niger and about the circumstances surrounding that trip. In advance of that show, she spoke to Mr. Wilson by telephone, *see The Politics of Truth*, at 333-334, and she and her producers presumably performed at least some background research on Mr. Wilson and his professional and personal history.

Finally, three months after Mr. Wilson's appearance on *Meet the Press*, Ms. Mitchell was asked on television, "Do we have any idea how widely known it was in Washington that Joe Wilson's wife worked for the CIA?" She responded, "It was widely known among those of us who cover the intelligence community and who were actively engaged in trying to track down who among the foreign service community was the envoy to Niger." Tr., *Capital Report* (CNBC Oct. 3, 2003) (Exh. T).

For these reasons, both Ms. Mitchell and NBC are likely to have documents that Mr.
Libby can use in his defense at trial. Ms. Mitchell and NBC move to quash Mr. Libby's
subpoena on the ground that they have no documents that refer to Ms. Wilson or that, in their
judgment, indicate that any employee of NBC was aware that she worked for the CIA prior to
July 14, 2003. But Mr. Libby's subpoena requests are not limited to documents meeting that
description. And, as shown below, documents responsive to Mr. Libby's other requests
constitute relevant and admissible evidence in his defense.[7]

### 1.   All documents relating to the conversation Mr. Libby had with Mr. Russert on July 10 or 11, 2003 are relevant to the defense

Mr. Libby is entitled to obtain and use at trial all evidence that shows that his recollection
of his July 10 or 11 conversation with Mr. Russert is correct, and that it is Mr. Russert who has
misrecollected or misstated the facts. Indeed, Mr. Russert—who says he has no documents
responsive to Mr. Libby's subpoena—apparently made no notes of the conversation,
contemporaneously or after the fact. Moreover, he recounted his recollection to the government
more than a year after it occurred. Accordingly, Mr. Libby has subpoenaed from NBC
documents that purport to describe any part of that July 10 or 11 conversation (*NBC Request 3*).[8]
NBC responds that it has documents responsive to that request—namely, documents relating to
public statements disseminated by NBC about the conversation. But it contends that those

---

[7] Notably, the government never issued any subpoena duces tecum to NBC, Mr. Russert, Ms.
Mitchell or any other employee of the network. As Ms. Mitchell has publicly revealed, the
government has never even questioned her informally about what she knew prior to July 14,
2003. *See* Tr., *Imus in the Morning* (MSNBC Nov. 23, 2005) (Exh. U). Therefore, Mr. Libby
has not and will not receive any documents or information relating to these individuals from the
government.
[8] According to its motion, NBC does not have documents responsive to Requests 1, 3 or 4 of Mr.
Libby's subpoena to the network. Ms. Mitchell does not have documents responsive to requests
1 or 2 of the subpoena to her.

documents are inadmissible and not relevant to Mr. Libby's defense. *See* NBC/Mitchell Mot. at 9. That is incorrect.

Documents relating to communications between Mr. Libby and Mr. Russert are relevant to the crimes charged in the indictment—whether or not the documents explicitly state that Mr. Libby and Mr. Russert discussed Ms. Wilson's employment. *See* Mem. Op., at 1 n.3. In a case where a defendant is charged with lying about a conversation, he is entitled to obtain and use at trial *any* evidence that tends to show that that conversation did not occur as alleged. The documents Mr. Libby seeks are likely to fit that description.

Indeed, regardless of whether the documents mention Ms. Wilson, they may help Mr. Libby to show that Mr. Russert was aware of her CIA employment when the July 10 or 11 conversation took place—and therefore may have asked Mr. Libby if he knew it too. In that regard, we note that NBC's carefully worded public statements have *never* completely disclaimed that Mr. Russert knew that Mr. Wilson's wife was employed by the CIA prior to July 14, 2003. (Nor, for that matter, does NBC's motion to quash.) Rather, they have said only that "Mr. Russert told the Special Prosecutor that, at the time of the conversation, he did not know *Ms. Plame's name or that she was a CIA operative* and that he did not provide *that* information to Mr. Libby." "NBC News Statement," Aug. 9, 2004 (Exh. A to NBC/Mitchell Mot.) (emphasis added); *id.* ("Mr. Russert said that he first learned *Ms. Plame's name and her role at the CIA*" when Mr. Novak's July 14 column was published) (emphasis added). But Mr. Libby never testified that Mr. Russert mentioned Ms. Plame's "name" or her "role" at the CIA. At trial, Mr. Libby is clearly entitled to confront Mr. Russert with any document that may shed light on why NBC has not declared unequivocally that Mr. Russert did not know Mr. Wilson's wife worked for the CIA when he spoke to Mr. Libby.

27

**2.    Documents related to Ms. Mitchell's public statement that she was aware that "Joe Wilson's wife worked for the CIA" prior to July 14, 2003 are relevant to the defense**

As noted above, on October 3, 2003, Ms. Mitchell was asked on CNBC's *Capital Report* whether it was "widely known" that "Joe Wilson's wife worked for the CIA" prior to Mr. Novak's column.  She responded,

> It was widely known among those of us who cover the intelligence community and who were actively engaged in trying to track down who among the foreign service community was the envoy to Niger.  So a number of us began to pick up on that.  But frankly I wasn't aware of her actual role at the CIA and the fact that she had a covert role involving weapons of mass destruction, not until Bob Novak wrote it.

Tr., *Capital Report* (Oct. 3, 2003).

The fact that Ms. Mitchell may have known about Ms. Wilson's employment prior to the Novak column would be important to the defense.  It makes it more likely that Ms. Mitchell shared this information with Mr. Russert—and that he in turn asked Mr. Libby if he knew it too. Indeed, Ms. Mitchell's public statements reveal that she, Mr. Russert and other NBC employees were actively discussing Mr. Wilson and the circumstances surrounding his trip to Niger during the week that Mr. Russert and Mr. Libby spoke. *See* Tr., *Imus in the Morning*, (Nov. 23, 2005).

Given this potentially critical line of defense, Mr. Libby will likely call Ms. Mitchell as a witness and ask her about the meaning of her October 3, 2003 statement.  Accordingly, he has sought from both NBC and Ms. Mitchell all documents that "purport to discuss or explain that statement" for use at trial (*NBC Request 5/Mitchell Request 3*).  NBC and Ms. Mitchell acknowledge that they have documents responsive to that request.  But again they claim that those documents are necessarily irrelevant to the defense because they do not refer to "Ms. Wilson or . . . her employment in any manner." NBC/Mitchell Mot. at 10.

Hard as it may be to believe that materials responsive to this request include *no* mention of Ms. Wilson at all (by name or otherwise), we can nonetheless envision numerous documents fitting that description that would tend to show Ms. Mitchell's pre-July 14 knowledge. For example, Ms. Mitchell may have sent an email expressing regret over her statement on *Capital Report* or concern over its implications—but not denying that she meant what she said or that her statement was accurate. Mr. Libby is entitled to confront Ms. Mitchell with documents of that kind when he questions her about the meaning of her October 3, 2003 statement at trial.

Likewise, the documents Mr. Libby seeks will help to establish that Ms. Mitchell has no reasonable basis for claiming her statement meant anything other than that she knew "Joe Wilson's wife worked for the CIA" before July 14, 2003. Ms. Mitchell has repeatedly attempted to retract that statement, and endeavored to explain why, taken in context, it does not have its obvious meaning. *See, e.g.*, Tr., *Imus in the Morning* (MSNBC Nov. 10, 2005) (Exh. V); Tr., *Imus in the Morning* (Nov. 23, 2005). She makes a similar attempt here, pointing out that on the same program she also said that Mr. Novak's column was a "bombshell" because it revealed that Mr. Wilson's wife was "an operative . . . at the CIA." NBC/Mitchell Mot. at 10 n.4. But the fact that Ms. Mitchell learned the *specific nature* of Ms. Wilson's job at the CIA by reading Mr. Novak's column (and was surprised by it) in no way suggests that she did not already know Ms. Wilson was employed in some capacity by the agency. *See* Tr., *Capital Report* (Oct. 3, 2003) ("I wasn't aware of her *actual role* at the CIA and the fact that she had a *covert role involving weapons of mass destruction*, not until Bob Novak wrote it") (emphasis added).

Presumably, if NBC or Ms. Mitchell had *any* reasonable basis for claiming that her statement was not an admission that she knew about Ms. Wilson's employment before July 14, it would be stated in this motion and reflected in documents describing or explaining the statement.

Mr. Libby is entitled to use those documents at trial to contend that, in fact, no reasonable explanation exists; that Ms. Mitchell *did* know about Ms. Wilson prior to Mr. Novak's column; and that Ms. Mitchell may well have shared that information with Mr. Russert in advance of his conversation with Mr. Libby.

### 3.   Mr. Libby is entitled to obtain all documents describing his conversations with Ms. Mitchell during the relevant period

Ms. Mitchell acknowledges that she has "handwritten notes of what could be a single conversation she had with [Mr. Libby]" during the period relevant to the indictment (*Mitchell Request 5*). She claims, however, that Mr. Libby is not entitled to obtain these notes because they "contain[] no information of any kind relating either to Ms. Wilson or to her employment." NBC/Mitchell Mot. at 12-13. Ms. Mitchell therefore insists that these notes "bear[] no relevance to the criminal charges against [Mr. Libby]." *Id.* at 13.

That argument defies common sense. The fact that Mr. Libby talked to Ms. Mitchell during the time relevant to the indictment and *did not* mention that Mr. Wilson's wife worked for the CIA has obvious relevance to this case. Among other things, it directly undermines the government's claim that Mr. Libby was engaged in a "vigorous effort" to discredit Mr. Wilson by telling reporters about his wife's employment. Govt's Resp. to Def.'s Third Mot. to Compel, at 26, 28. Mr. Libby is entitled to use Ms. Mitchell's notes in examining her about what Mr. Libby *was* focused on and the fact that it had nothing to do with Ms. Wilson.

### 4.   Mr. Libby is entitled to obtain and use at trial documents reflecting communications regarding Mr. Wilson between employees at NBC and government officials critical to this case

Finally, Mr. Libby seeks from NBC and Ms. Mitchell documents reflecting communications that reporters had regarding Mr. Wilson with certain individuals critical to this case (*NBC Request 6/Mitchell Request 4*). Once again, NBC and Ms. Mitchell acknowledge that

they have responsive documents, yet insist that they are not relevant because they do not "relate, in any manner, either to Ms. Wilson or her employment." NBC/Mitchell Mot. at 11. Once again, NBC and Ms. Mitchell are wrong. Mr. Libby has already explained, in connection with *The New York Times*'s motion to quash, why documents responsive to this request are directly relevant to the defense. *See supra* at 17-22. Those reasons are equally applicable here. We note, in this regard, that public reports reveal that NBC reporter David Gregory and other NBC personnel were present on the July 2003 trip to Africa and therefore like other reporters may have been prompted by Mr. Fleischer to "look into" who sent Mr. Wilson to Niger, and given more detailed information as well. *See* Tr., *NBC Nightly News: CIA Director George Tenet accepts the blame for Bush's misinformation in his State Of The Union Address* (NBC July 12, 2003) (D. Gregory reporting) (Exh. W).

### D.    Mr. Libby's Subpoenas To *Time* Inc. And Matthew Cooper

Mr. Cooper's recollection of what he asked Mr. Libby on July 12, 2003, about Ms. Wilson and how Mr. Libby responded is critical to the government's case. None of Mr. Cooper's documents produced to date—including contemporaneous notes of the call—support the indictment's allegation that Mr. Libby confirmed Ms. Wilson's involvement in her husband's trip. *See* Indictment at Count 3, ¶ 3. In fact, there is no mention in these nearly verbatim notes, in subsequent emails with colleagues, or elsewhere that Mr. Libby made any comment about Ms. Wilson at all. Given the government's apparent reliance upon nothing more than Mr. Cooper's word, any evidence casting doubt on, or otherwise undermining, Mr. Cooper's memory of a small aspect of a conversation nearly three years ago is crucial to Mr. Libby's defense. Mr. Libby now seeks to obtain such information from Time Inc. ("*Time*") and Mr. Cooper by subpoenaing narrowly delineated categories of documents that he knows or has reason to believe

31

they possess. These documents can be used at trial to undermine Mr. Cooper's characterization of Mr. Libby's comment, support Mr. Libby's recollection, and show bias on Mr. Cooper's part.

> **1.      The general objections raised by *Time* and Mr. Cooper are meritless**

As an initial matter, *Time* does not deny that documents prepared or received by Mr. Cooper are relevant. Nor could it given this Court's prior ruling. *See* Mem. Op. at 1, n.3. If *Time* has any documents meeting this description, they must be produced.

*Time* does assert that documents possessed by *Time* employees *other* than Mr. Cooper are irrelevant because they "can have no bearing" on what Mr. Libby said to Mr. Cooper. Time Mot. at 4. Nothing could be farther from the truth. Mr. Cooper did not operate in isolation as *Time* implies; rather, he was part of a team of at least six reporters and editors who covered the dispute between Mr. Wilson and the White House and frequently shared information. After talking to Mr. Libby on July 12, Mr. Cooper emailed a comprehensive summary of the conversation to an internal *Time* distribution list. Further, Mr. Cooper co-authored *A War on Wilson?*, the first article *Time* published mentioning Ms. Wilson, with two other reporters. Matthew Cooper, Massimo Calabresi, & John Dickerson, Time.com, July 17, 2003 (Exh. X; hereinafter "*A War on Wilson?*").

By casting the indictment merely in terms of Mr. Libby's memory of his conversation with Mr. Cooper, *Time*'s argument presents an erroneously narrow view of relevance that misses half the story. This indictment is as much about Mr. Cooper's recollection as it is about Mr. Libby's. Mr. Cooper and Mr. Libby have recalled their conversation differently, both as to what Mr. Cooper asked and how Mr. Libby responded. Mr. Libby has testified that he told Mr. Cooper that reporters were saying that Ms. Wilson worked for the CIA, but that he did not know if this was true. *See* Indictment, Count 3, ¶ 2. According to Mr. Cooper's account, he asked if Mr. Libby had heard that Ms. Wilson was involved in sending Mr. Wilson to Niger. Mr. Libby

replied, "Yeah, I've heard that, too," or "words to that effect." Matthew Cooper, *What I Told The Grand Jury*, Time, July 25, 2005 (Exh. Y; hereinafter "*What I Told the Grand Jury*"); Matthew Cooper, *What Scooter Libby and I Talked About*, Time, October 30, 2005 (Exh. Z; hereinafter "*What Scooter Libby and I Talked About*"). Indeed, what Mr. Cooper had learned about Ms. Wilson was clearly a topic of conversation in *Time*'s Washington bureau. *See* Michael Isikoff & Evan Thomas, *Back on the Stand*, Newsweek, April 30, 2006 (Viveca Novak learned that Mr. Rove was Mr. Cooper's source from office "chatter") (Exh. AA). What matters, therefore, is not just what Mr. Libby said, as *Time* contends, but also what *Mr. Cooper* said and why he may have said it.

Further, *Time* has not articulated specific objections to the subpoenas but rather has asserted conclusory challenges to their relevance and specificity. Such generalized attacks do not assist the court in evaluating the subpoena's validity and are disfavored. *See Poindexter*, 727 F. Supp. at 1510-11 (lack of detail renders it "not clear . . . on what basis the Court is to make the determination" requested of it by the moving party). Mr. Cooper offers no particularized challenge to the subpoena whatsoever. Instead, he merely adopts *Time*'s argument—which does him little good since *Time* specifically limits its arguments to documents possessed by employees *other than Mr. Cooper*. *See* Time Mot. at 4.

### 2. Mr. Libby's Subpoenas Satisfy *Nixon*

Mr. Libby's subpoenas focus on a limited set of documents probative of, and admissible to show, what Mr. Cooper asked Mr. Libby about Ms. Wilson, how Mr. Libby responded, and the credibility of Mr. Cooper's recollection.

*Requests 1, 2 and 3* seek documents within specified date ranges that mention Ms. Wilson, demonstrate awareness of her CIA affiliation, or were prepared in anticipation of or that

describe Mr. Cooper and Mr. Libby's July 12 call.[9]  These requests go to the heart of the

indictment's allegation that Mr. Libby confirmed for Mr. Cooper that Ms. Wilson worked at the

CIA.  It is hard to believe the government's allegation—that Mr. Libby confirmed this

affiliation—if not a single employee of *Time* took a moment to memorialize this fact.  This is

particularly true given that, according to Mr. Cooper, Mr. Libby's comment about Ms. Wilson

was used to support statements in *A War on Wilson? See* Tr., *Meet the Press* (NBC July 17,

2005), at 2-3 (Exh BB; hereinafter "*Meet the Press* Tr.").  Similarly, documents provided by the

Special Counsel[10] show that Mr. Cooper maintained a "Scooter Libby file" on a *Time* database

called Nirvana that he updated after talking with Mr. Libby on July 12, 2003.  The defense does

not appear to have received this file which could establish what Mr. Cooper's notes of the July

12 call indicate—that Mr. Libby did not mention that he had heard that Ms. Wilson worked at

the CIA.

        In addition, these requests are likely to reach evidence establishing Mr. Cooper's pro-

Wilson bias when he talked with Mr. Libby, afterwards as he drafted *A War on Wilson?*, and

finally, when he testified.  *See, e.g., Meet the Press* Tr. at 5 (stating he "believe[s] there was

something like a war on Wilson going on"); Tr., *Reliable Sources*, at 2 (CNN Dec. 12, 2004)

(Exh. CC) (admitting that *A War on Wilson?*'s purpose was to alert readers that "they're

smearing [Wilson].  There are some malevolent things going on here").  Mr. Cooper, one email

suggests, viewed Mr. Libby's alleged comments during their call as part of a personal attack on

---

[9]  Requests 1, 2 & 3 for both *Time* and Cooper focused on identical categories of documents and thus are not delineated as "Time Request 1", "Cooper Request 1," etc., as is necessary for other requests.

[10]  The Special Counsel has provided the defense with documents previously subpoenaed from *Time* and Mr. Cooper.  Because of the limited scope of these subpoenas, they did not reach the relevant documents sought here.

Mr. Wilson rather than as what his own notes reflect—a fact-based criticism of the merits of Mr. Wilson's claims.

Further, drafts and other documents related to *What I Told the Grand Jury* and *What Scooter Libby and I Talked About*, Mr. Cooper's two public accounts of the July 12 conversation, are likely to contain Mr. Cooper's reflections and characterizations of what Mr. Libby said and did not say. Such statements go to Mr. Cooper's bias. *See What I Told the Grand Jury* at 2 (stating that at the time he found the administration's attacks "unnecessary"). In addition, these articles support Mr. Libby's contention that Ms. Wilson was a peripheral issue, and undermine the indictment's allegation that Mr. Libby confirmed for Mr. Cooper "without qualification" that he heard Ms. Wilson worked at the CIA. *See What Scooter Libby And I Talked About* at 1, 2 (stating that his exchange with Mr. Libby about Ms. Wilson was "not especially provocative" and "tiny"). As was evident from drafts the defense has reviewed of *A War On Wilson?*, the editing process at *Time* is replete with back and forth between reporter and editor as details are discussed, statements are justified, and questions regarding sources are raised and addressed. These drafts, therefore, are likely to contain unpublished material relevant to challenging Mr. Cooper's testimony.

*Time Request 4/Cooper Request 5* seek documents related to communications between *Time* employees and eight individuals concerning Mr. Wilson. Given that Mr. Cooper's colleagues likely would have shared what they learned about Mr. Wilson with Mr. Cooper, these conversations may assist in showing the evolution of his pro-Wilson bias.

Furthermore, for the reasons already discussed with respect to *The New York Times*'s subpoena, these requests seek important impeachment evidence admissible in Mr. Libby's defense. *See supra* at 17-22. We specifically draw the Court's attention to press reports

indicating that on July 11, 2003, Mr. Fleischer, along with a second senior administration official, encouraged John Dickerson, a *Time* reporter, to focus on who sent Mr. Wilson to Niger. *See Where's My Subpoena?*; Howard Fineman, *Rove at War*, Newsweek, July 25, 2005. According to Mr. Dickerson's recounting of those conversations, Mr. Fleischer may have discussed in detail problems with Mr. Wilson's trip and subsequent report. *See Where's My Subpoena?*. Mr. Dickerson took notes of these conversations and agreed with Mr. Cooper "to point out *in our files to the cover story* that White House officials were going so directly after Wilson." *Id.* (emphasis added). This statement strongly indicates that separate written documentation of these conversations exist.

In addition, evidence strongly indicates that *Time* reporters contacted other individuals named in these requests during this period. For example, after talking with Mr. Rove, Mr. Cooper asked Tim Burger, another *Time* reporter, to contact Bill Harlow, the CIA spokesperson, and follow-up on information from Mr. Rove. There is every reason to believe that Mr. Harlow would have been forthcoming with information about Ms. Wilson. *See supra* at 21-22. Any information Mr. Harlow provided was likely uploaded into Nirvana or otherwise disseminated.

Finally, emails also show that a member of Mr. Cooper's team of reporters—probably Massimo Calabresi—had contacted Mr. Wilson prior to the Rove conversation and later followed up with Mr. Wilson to obtain his reaction. Notes from the second call, for example, could establish that the *Time* reporters interpreted Mr. Wilson's comments as confirming Mr. Rove's allegation.

*Time Request 5/Cooper Request 4* seek the original version of what appears to be Mr. Cooper's contemporaneously typed notes of his conversation with Mr. Libby. A clean version is

requested because the version *Time* provided to the Special Counsel is cut off at the margins and contains redactions of certain information for no apparent reason.

*Time Request 6* seeks documents relating to Mr. Dickerson's aforementioned July 11, 2003 conversations with the two government officials. In addition to providing information that may impeach Mr. Fleischer, these notes are relevant to Mr. Cooper's state of mind when he talked with Mr. Libby. The day before that call, Mr. Dickerson informed Mr. Cooper that government officials were pointing reporters to who sent Mr. Wilson just after Mr. Rove revealed that Ms. Wilson had sent her husband, which suggested to Mr. Cooper a concerted effort to discredit Mr. Wilson.

Because Mr. Libby's narrowly tailored requests to Mr. Cooper and *Time* easily clear *Nixon*'s three hurdles, their motions to quash should be denied.

## III.    THE MOVANTS ENJOY NO PRIVILEGE, UNDER THE CONSTITUTION OR THE COMMON LAW, TO DEPRIVE MR. LIBBY OF THE EVIDENCE HE SEEKS

The foregoing makes clear that each of Mr. Libby's subpoenas easily satisfies the criteria set forth in *Nixon*. The Movants contend, however, that *even if* Mr. Libby's subpoenas are *Nixon*-compliant, they should be quashed. They claim their newsgathering function entitles them to a special privilege, under the First Amendment and the common law, to deprive Mr. Libby of admissible evidence relevant to his defense. The Movants' constitutional claim is foreclosed by Supreme Court precedent and the law of this circuit. Their request for a new common law privilege—unrecognized by any court in this jurisdiction—is unfounded and should be denied.

### A.    The First Amendment Does Not Permit Reporters Or News Organizations To Withhold From A Criminal Defendant Evidence Relevant To The Charges Against Him

In *Branzburg v. Hayes*, the Supreme Court held that "the *only* testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution is the Fifth Amendment privilege

against compelled self-incrimination." 408 U.S. 665, 689-90 (1972) (emphasis added). It refused "to create another [privilege] by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy." *Id.* More recently, in *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141 (D.C. Cir. 2006), *modifying* 297 F.3d 964 (D.C. Cir. 2005) ("*Miller*"), the D.C. Circuit held that *Branzburg* meant what it said. *See id.* at 1147-49. It commanded the reporters and news organizations in that case to testify and to give the grand jury the documents it sought.

Notwithstanding the flat rejection of their privilege claims in *Miller*, the *same* reporters and news organizations now claim before this Court that Mr. Libby's subpoenas—subpoenas that seek admissible evidence relevant to his innocence—should not be enforced.[11] They contend that *Branzburg* and *Miller* do not control because they involved grand jury proceedings, and here Mr. Libby is seeking evidence related to charges against him in a *criminal trial*. The Movants' attempt to distinguish those cases is utterly unpersuasive.

*Branzburg* itself makes clear that the Supreme Court's refusal to grant reporters a constitutional privilege that "other citizens do not enjoy" applies to criminal proceedings across the board. 408 U.S. at 689; *see* 679, 681, 686, 690, 693; *Liddy*, 354 F. Supp. at 213, n.13 (explaining why the principles "enunciated [by *Branzburg*] are of sufficient breadth to be controlling [where evidence is sought for a criminal trial]"). The reason is obvious. It is absurd to contend that a reporter—who deserves no special treatment before a grand jury—may nonetheless invoke the First Amendment to stonewall a criminal defendant who has been

---

[11] Ms. Miller does not raise a specific claim of privilege, though she does contend that her motion to quash deserves special consideration because of the "journalistic" material Mr. Libby seeks to obtain. *See infra*, at 45.

indicted by that grand jury and seeks evidence to establish his innocence. The same argument was dismissed out of hand by Chief Judge Sirica in *United States v. Liddy*.

As in this case, the reporters in *Liddy* sought to deprive a criminal defendant of evidence relevant to his defense (specifically, potential impeachment material). They argued that *Branzburg* was inapposite because it involved a grand jury proceeding. The court disagreed and ordered the reporters to turn over the evidence, observing that "while the public has a crucial interest in the investigation and punishment of criminal activity"—an interest sufficient to overcome a reporter's desire to maintain confidentiality—"it must have an even *deeper* interest in assuring that every defendant receives a fair trial"—an interest that eclipses whatever speculative harm the reporters could claim. *Liddy*, 354 F. Supp. at 215; *see Branzburg*, 408 U.S. at 682 ("[I]t is clear that the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability"). That is particularly true here since the Movants claim a privilege that extends *beyond* confidential sources and information. *See LaRouche*, 841 F.2d at 1181 (no "chilling effect could result from the disclosure of statements made for publication without any expectation of confidentiality").

Indeed, the right of a criminal defendant to the production of evidence has "constitutional dimensions," *Nixon*, 418 U.S. at 711-12, and cannot possibly be trumped by potential infringement of the journalistic process. The Sixth Amendment explicitly confers upon every defendant the right to confront the witnesses against him, and the Fifth Amendment guarantees that no person shall be deprived of liberty without due process of law. As the Supreme Court recognized in *Nixon*, "[i]t is the manifest duty of the courts to vindicate those guarantees, and to accomplish that *it is essential that all relevant and admissible evidence be produced*." *Id.* at 711.

Consistent with those principles, the D.C. Circuit has *never* permitted a reporter to withhold from a criminal defendant evidence relevant to his defense on grounds of privilege. *United States v. Ahn*, 231 F.3d 26 (D.C. Cir. 2000), relied on heavily by the Movants, does not support their position. In that case, the defendant sought to withdraw a guilty plea, claiming that the government breached its plea agreement by leaking information about his case to reporters. The government denied doing so, and the defendant subpoenaed the reporters to reveal their sources. *See id.* at 36-37. The district court granted the reporters' motion to quash—finding that the "reporters' testimony was not essential and crucial to [the defendant's] case and *was not relevant to determining [his] guilt or innocence*"—and the circuit court affirmed. *Id.* at 37 (emphasis added). Contrary to what the Movants suggest, *Ahn* did not consider whether—much less suggest that—the First Amendment could shield a reporter from turning over evidence sought by a criminal defendant to prove his innocence at trial. Likewise, in *United States v. Hubbard*, 493 F. Supp. 202 (D.D.C. 1979), the question was whether a reporter should be required to turn over evidence related to a defendant's *motion to suppress*, and the court concluded that the evidence sought was "hearsay," "merely cumulative," and "less than the best evidence available." *Id.* at 205. The same is not true here.[12]

---

[12] By contrast, where specifically confronted with the issue, numerous circuit courts have rejected the notion that a reporter has a constitutional right to withhold evidence relevant to a criminal defendant's guilt or innocence at trial. *See, e.g., In re Shain*, 978 F.2d 850, 852 (4th Cir. 1992) ("[R]eporters have no privilege different from that of any other citizen not to testify about knowledge relevant to a criminal prosecution"); *United States v. Cutler*, 6 F.3d 67 (2d Cir. 1993) (defendant is entitled to production of "Reporters' unpublished notes and outtakes" relevant to his defense, notwithstanding reporters' claim of privilege; and limiting *United States v. Burke*, 700 F.2d 70 (2d Cir. 1983), which had recognized a reporter's privilege to its facts); *Smith*, 135 F.3d at 970-71 ("*Branzburg* gave no indication that it meant to limits its holding to grand jury subpoenas"); *see also McKevitt v. Pallasch*, 339 F.3d 530, 533 (7th Cir. 2003) ("We do not see why there need be special criteria [for obtaining documents] merely because the possessor of the documents . . . is a journalist").

*Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981) and the litany of other *civil* cases the

Movants cite are also inapposite. In *Zerilli*, the D.C. Circuit recognized that a reporter's interest

in protecting his source could, depending on the showing, overcome a civil litigant's interest in

disclosure. *See* 656 F.2d at 710-11. But the calculus is obviously different where a criminal

defendant invokes his constitutional right to evidence necessary to present his defense and to

confront the witnesses against him. *See Miller*, 438 F.3d at 1149 ("Even if *Zerilli* states the law

applicable to civil cases, this is not a civil case. *Zerilli* could not subtract from the Supreme

Court's holding in *Branzburg*"); *United States v. Smith*, 135 F.3d 963, 972 (5th Cir. 1998).

*Zerilli* itself indicates that a reporter's privilege can only apply in civil cases. *See* 656 F.2d at

711, 712 n.43.

For the same reasons, the Constitution does not provide an "editorial privilege" that

would allow a newspaper or magazine to withhold, for example, draft articles or editor's notes

relevant to a criminal prosecution. Indeed, the Supreme Court has cast serious doubt on whether

that privilege exists even in civil cases. *See Herbert v. Lando*, 441 U.S. 153 (1979); *see id.* at

210 (Marshall, J., dissenting) (concluding that such a privilege should exist in certain *civil* cases

but noting that "[d]ifferent considerations would, of course, obtain if a privilege for editorial

communications were sought in conjunction with criminal proceedings") (citing *Nixon* and

*Branzburg*); *see also Riley v. City of Chester*, 612 F.2d 708, 716 (3d Cir. 1979) (recognizing that

an editorial privilege may exist in some situations but acknowledging that it did not reach

situations where reporters allegedly possess relevant information in a criminal case).

**B.    This Court Should Not Recognize A New Reporters' Privilege Under The Federal Common Law**

The Movants' request that this Court recognize a new reporters' privilege under the

federal common law should also be denied. Courts have repeatedly declined to recognize a

common law reporters' privilege, in criminal and civil cases alike. *See Lee v. Dept. of Justice*, 401 F. Supp. 2d 123, 139 (D.D.C. 2005); *see generally Branzburg*, 408 U.S. at 685 ("At common law, courts consistently refuse to recognize the existence of any privilege authorizing a newsman to refuse to reveal confidential information to a grand jury"). And for good reason. The Supreme Court has warned that privileges should not be created or expanded lightly, since any "exception[] to the demand for every man's evidence . . . [is] in derogation of the search for truth." *Nixon*, 418 U.S. at 710. Yet, here, the Movants urge the Court to reach outside established precedent and recognize a new privilege that would allow them to withhold from a criminal defendant relevant evidence admissible to prove his innocence of criminal charges. They have not come close to making the showing that would justify that extraordinary action. *See Jaffee v. Redmond*, 518 U.S. 1, 10-13 (1996).

    *First*, while a number of states and the District of Columbia have enacted reporter shield statutes, the statutes vary widely and Movants do not claim that those statutes have been interpreted to permit a reporter to deprive a criminal defendant of specific evidence relevant to prove his innocence at trial. *See, e.g., Delaney v. Superior Court*, 789 P.2d 934, 946 (Cal. 1990) (state "shield law's protection is overcome in a criminal proceeding on a showing that nondisclosure would deprive the defendant of his federal constitutional right to a fair trial"). As important, the *federal* legislature has in the past considered and declined to adopt a federal shield law. *See Univ. of Penn. v. EEOC*, 493 U.S. 182, 189 (1990) (courts should be "especially reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself"); *see Miller*, 438 F.3d at 1157-58 (Sentelle, J., concurring) (detailing numerous reasons why the creation of a reporters' privilege is better left to the legislature).

42

***Second***, while a free press is an important public good, requiring a reporter to respond to

narrowly delineated requests for evidence relevant to a criminal defendant's innocence imposes

no undue burden on newsgathering. *See Branzburg*, 408 U.S. at 690-91 (concluding that asking

"reporters, like other citizens, [to] respond to relevant questions put to them in the course of a

valid grand jury investigation *or criminal trial*" imposes at most an "uncertain burden on

newsgathering") (emphasis added). It "involves no restraint on what newspapers may publish or

on the type or quality of information reporters may seek to acquire, nor does it threaten the vast

bulk of confidential relationships between reporters and their sources." *Id.* at 691. The

Movants' fear of harm is particularly hard to accept given that much of the evidence they seek to

protect does not even constitute confidential information. In *Branzburg*, the Supreme Court

found no evidence that the press had been unduly hampered in its functioning by the absence of a

reporters' privilege for the past 200 years. *See id.* at 693 ("[T]he evidence fails to demonstrate

that there would be a significant constriction of the flow of news to the public if this Court

reaffirms the prior common law and constitutional rule regarding the testimonial obligations of

newsmen"). The motions to quash provide no compelling reason to believe that the reality is

different today. *See Lee*, 401 F. Supp. 2d at 141.

***Finally***, any *speculative*, generalized harm to newsgathering that might be caused by a

*Nixon*-compliant subpoena is clearly outweighed by a criminal defendant's specific,

individualized right to obtain evidence that may establish his innocence, and the public's interest

in ensuring the defendant receives a fair trial. *See Nixon*, 418 U.S. at 713 ("[W]hen the ground

for asserting privilege as to subpoenaed materials sought for use in a criminal trial is based only

on the generalized interest in confidentiality," the privilege "must yield to the demonstrated,

specific need for evidence in a pending criminal trial"). "[T]he allowance of the privilege to

withhold evidence that is demonstrably relevant in a criminal trial would cut deeply into the

guarantee of due process of law and gravely impair the basic function of the courts." *Id.* at 712.

Because the Movants' request for a common law privilege has no basis in reason or experience,

it should be denied.

### C.    Even If There Were A Reporters' Privilege It Would Be Qualified And Easily Overcome By The Circumstances Of This Case.

Even if there were a reporter's privilege, it would (as the Movants concede) be a qualified

one—and easily overcome in this case. *See Miller*, 438 F.3d at 1150 (holding that even if a

reporters' privilege *did* exist at common law it could not be absolute); *Zerilli*, 656 F.2d at 712-13

(reporters' privilege is overcome where information goes to the "heart of the matter" and there

are no reasonable alternative methods of obtaining it) (quotation mark and citation omitted);

*Hubbard*, 493 F. Supp. at 205 (information "necessary to a fair hearing" must be turned over).

As shown above, the documents Mr. Libby seeks provide evidence that he told the truth to the

FBI and the grand jury; that it is the witnesses against him who may be misstating the facts; and

that even if portions of his testimony were inaccurate, they were not intentionally false. If such

evidence does not go to "the heart of the matter" in a case charging perjury, false statements, and

obstruction, it is hard to know what would. Furthermore, much if not all of the evidence Mr.

Libby seeks is within the Movants' exclusive control and cannot be obtained through alternative

means. If he does not obtain that evidence through these subpoenas, he will be deprived of it

altogether. For those reasons, any reporters' privilege that might possibly exist must yield.

*    *    *

Unlike the other Movants, Ms. Miller does *not* claim a privilege. She does, however,

assert that the Court should be particularly "critical" in considering whether to enforce Mr.

Libby's subpoena since it seeks documents that contain "sensitive information obtained from . . .

journalistic sources." Miller Mot. at 6. The other Movants make similar arguments, separate

44

and apart from their claims of privilege. These arguments are a backdoor attempt to obtain special treatment under the law. In considering motions to quash, "[c]ourts should simply make sure that a subpoena duces tecum directed to the media, like any other subpoena duces tecum, is reasonable in the circumstances, which is the general criterion for judicial review of subpoenas." *McKevitt*, 339 F.3d at 533. Here, Mr. Libby's subpoenas are narrowly tailored to obtain relevant and admissible evidence that he knows or has good reason to believe the Movants possess. In considering reasonableness, Mr. Libby's entitlement to that evidence clearly justifies whatever (speculative) effect enforcement of the subpoenas may have.

### CONCLUSION

For the foregoing reasons, each of the Movants' motions to quash should be denied and Mr. Libby's subpoenas promptly enforced.

May 1, 2006                          Respectfully submitted,

_____/s/_____                   _____/s/_____
Theodore V. Wells, Jr.              William H. Jeffress, Jr.
D.C. Bar No. 468934                 D.C. Bar No. 041152
James L. Brochin                    Alex J. Bourelly
D.C. Bar No. 455456                 D.C. Bar No. 441422
Paul, Weiss, Rifkind, Wharton       Alexandra M. Walsh
   & Garrison LLP    D.C. Bar No. 490484
1285 Avenue of the Americas         Baker Botts LLP
New York, NY 10019-6064             1299 Pennsylvania Avenue, NW
(212) 373-3089                      Washington, DC 20004
                                    (202) 639-7751

_____/s/_____                   _____/s/_____
Joseph A. Tate                      John D. Cline
Dechert LLP                         D.C. Bar No. 403824
2929 Arch Street                    Jones Day
Cira Centre                         555 California Street, 26th Floor
Philadelphia, PA 19104              San Francisco, CA 94104
(215) 994-2000                      (415) 875-5812