# EXHIBIT A



SUSAN E. WEINER
Executive Vice President
and Deputy General Counsel

30 Rockefeller Plaza
New York, NY 10112
212 664 2806 tel
212 664 6572 fax
susan.weiner@nbcuni.com

April 18, 2006

William H. Jeffress, Jr., Esq.
Baker Botts LLP
The Warner
1299 Pennsylvania Ave., NW
Washington, D.C.  20004-2400

Re:  Subpoenas in USA v. I. Lewis Libby

Dear Bill:

On behalf of I. Lewis Libby, you served three subpoenas seeking documents from NBC News, Tim Russert and Andrea Mitchell.

I am writing to confirm that, following service of the subpoenas, you advised me that January 1, 2003 was the "start date" of the time period covered by items 1 and 2 in each subpoena, item 6 of the subpoena to NBC News, item 5 of the subpoena to Mr. Russert and item 4 of the subpoena to Andrea Mitchell.  You also stated that the subpoenas do not seek statements broadcast by NBC or made by or on behalf of NBC, Mr. Russert or Ms. Mitchell and reported in other media.

Mr. Russert has no non-privileged documents that are responsive to the subpoena served upon him.  NBC News and Ms. Mitchell are filing a motion to quash the subpoenas served upon each of them.

Very truly yours,

Susan E. Weiner

Susan E. Weiner

# EXHIBIT B

# Holland+Knight

Tel  202 955 3000
Fax  202 955 5564

Holland & Knight LLP
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, D.C. 20006
www.hklaw.com

CHARLES D. TOBIN
(202) 419-2539
ctobin@hklaw.com

March 31, 2006

### Via Facsimile and U.S. Mail

William Jeffress, Esq.
Baker & Botts L.L.P.
1299 Pennsylvania Ave. NW
Washington, D.C. 20004-2400

Re:  U.S. v. Libby

Dear Mr. Jeffress:

We represent Cable News Network ("CNN") in connection with the Rule 17(c) subpoena for documents served on behalf of your client on or about March 16, 2006.

After a diligent search, CNN has found no documents in its possession, custody or control that would be responsive to the subpoena.

Please let me know if I may be of further assistance.

Very truly yours,

HOLLAND & KNIGHT LLP

Charles D. Tobin

cc:    Honorable Patrick J. Fitzgerald

CDT:hjc # 3683448_v1

# EXHIBIT C

WILMERHALE

Howard M. Shapiro

+1 202 663 6606 (t)
+1 202 663 6363 (f)
howard.shapiro@wilmerhale.com

April 14, 2006

*By Hand*

William H. Jeffress, Jr.
Baker Botts LLP
1299 Pennsylvania Avenue, NW
Washington, DC  20004

Re:    Subpoena

Dear Bill:

I write in response to the Subpoena to *The Washington Post*, served on April 13, 2006.

All documents in our possession responsive to the requests in paragraphs 1 and 2 have been produced to the Office of Special Counsel.  With regard to paragraph 3, after diligent search, we have not found any documents that identify the "senior administration official" or the other referenced individuals.  Regarding paragraph 4, the complete version of Bob Woodward's memo of his interview with Mr. Libby on June 27, 2003 is enclosed.

We are not aware of any other responsive documents.

Please let me know if you have any questions.

Sincerely,

Howard M. Shapiro

Enclosure

Wilmer Cutler Pickering Hale and Dorr LLP, 2445 M Street, NW, Washington, DC 20037
Baltimore  Beijing  Berlin  Boston  Brussels  London  Munich  New York  Northern Virginia  Oxford  Palo Alto  Waltham  Washington

# EXHIBIT D

Westlaw.                                                    The New York Times

10/16/05 NYT 131                                                      Page 1

10/16/05 N.Y. Times 131
2005 WLNR 16751238

                            New York Times (NY)
            Copyright (c) 2005 The New York Times. All rights reserved.

                              October 16, 2005

                                Section: 1

       A PERSONAL ACCOUNT; My Four Hours Testifying in the Federal Grand Jury Room

                               JUDITH MILLER

In July 2003, Joseph C. Wilson IV, a former ambassador, created a firestorm by
publishing an essay in The New York Times that accused the Bush administration of
using faulty intelligence to justify the war in Iraq. The administration, he
charged, ignored findings of a secret mission he had undertaken for the Central
Intelligence Agency -- findings, he said, that undermined claims that Iraq was
seeking uranium for a nuclear bomb.

It was the first time Mr. Wilson had gone public with his criticisms of the White
House. Yet he had already become a focus of significant scrutiny at the highest
levels of the Bush administration.

Almost two weeks earlier, in an interview with me on June 23, Vice President Dick
Cheney's chief of staff, I. Lewis Libby, discussed Mr. Wilson's activities and
placed blame for intelligence failures on the C.I.A. In later conversations with
me, on July 8 and July 12, Mr. Libby, who is Mr. Cheney's top aide, played down
the importance of Mr. Wilson's mission and questioned his performance.

My notes indicate that well before Mr. Wilson published his critique, Mr. Libby
told me that Mr. Wilson's wife may have worked on unconventional weapons at the
C.I.A.

My notes do not show that Mr. Libby identified Mr. Wilson's wife by name. Nor do
they show that he described Valerie Wilson as a covert agent or "operative," as
the conservative columnist Robert D. Novak first described her in a syndicated
column published on July 14, 2003. (Mr. Novak used her maiden name, Valerie Plame.)

This is what I told a federal grand jury and the special counsel investigating
whether administration officials committed a crime by leaking Ms. Plame's identity
and the nature of her job to reporters.

During my testimony on Sept. 30 and Oct. 12, the special counsel, Patrick J.

                 © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Fitzgerald, asked me whether Mr. Libby had shared classified information with me
during our several encounters before Mr. Novak's article. He also asked whether I
thought Mr. Libby had tried to shape my testimony through a letter he sent to me
in jail last month. And Mr. Fitzgerald asked whether Mr. Cheney had known what his
chief aide was doing and saying.

My interview notes show that Mr. Libby sought from the beginning, before Mr.
Wilson's name became public, to insulate his boss from Mr. Wilson's charges.
According to my notes, he told me at our June meeting that Mr. Cheney did not know
of Mr. Wilson, much less know that Mr. Wilson had traveled to Niger, in West
Africa, to verify reports that Iraq was seeking to acquire uranium for a weapons
program.

As I told the grand jury, I recalled Mr. Libby's frustration and anger about what
he called "selective leaking" by the C.I.A. and other agencies to distance
themselves from what he recalled as their unequivocal prewar intelligence
assessments. The selective leaks trying to shift blame to the White House, he told
me, were part of a "perverted war" over the war in Iraq. I testified about these
conversations after spending 85 days in jail for refusing to cooperate with the
grand jury inquiry. Having been summoned to testify before the grand jury, I went
to jail instead, to protect my source -- Mr. Libby -- because he had not
communicated to me his personal and voluntary permission to speak.

At the behest of President Bush and Mr. Fitzgerald, Mr. Libby had signed a blanket
form waiver, which his lawyer signaled to my counsel was not really voluntary,
even though Mr. Libby's lawyer also said it had enabled other reporters to
cooperate with the grand jury. But I believed that nothing short of a personal
letter and a telephone call would allow me to assess whether Mr. Libby truly
wished to free me from the pledge of confidentiality I had given him. The letter
and the telephone call came last month.

Equally central to my decision was Mr. Fitzgerald, the prosecutor. He had declined
to confine his questioning to the subject of Mr. Libby. This meant I would have
been unable to protect other confidential sources who had provided information --
unrelated to Mr. Wilson or his wife -- for articles published in The Times. Last
month, Mr. Fitzgerald agreed to limit his questioning.

Without both agreements, I would not have testified and would still be in jail.

I testified in Washington twice -- most recently last Wednesday after finding a
notebook in my office at The Times that contained my first interview with Mr.
Libby. Mr. Fitzgerald told the grand jury that I was testifying as a witness and
not as a subject or target of his inquiry.

This account is based on what I remember of my meetings with Mr. Fitzgerald and my
testimony before the grand jury. I testified for almost four hours, much of that
time taken by Mr. Fitzgerald asking me to decipher and explain my notes of my
interviews with Mr. Libby, which I had provided to him.

I was not permitted to take notes of what I told the grand jury, and my interview
notes on Mr. Libby are sketchy in places. It is also difficult, more than two
years later, to parse the meaning and context of phrases, of underlining and of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

parentheses. On one page of my interview notes, for example, I wrote the name "Valerie Flame." Yet, as I told Mr. Fitzgerald, I simply could not recall where that came from, when I wrote it or why the name was misspelled.

I testified that I did not believe the name came from Mr. Libby, in part because the notation does not appear in the same part of my notebook as the interview notes from him.

The First Libby Meeting


Early in my grand jury testimony, Mr. Fitzgerald asked me to describe my history with Mr. Libby and explain how I came to interview him in 2003.

I said I had known Mr. Libby indirectly through my work as a co-author of "Germs," a book on biological weapons published in September 2001. Mr. Libby had assisted one of my co-authors, and the first time I met Mr. Libby he asked for an inscribed copy of "Germs."

In June 2003 I had just returned from Iraq, where I had been embedded with a special military unit charged with finding Saddam Hussein's unconventional weapons. Now I was assigned to a team of reporters at The Times examining why no such weapons had been found.

On the afternoon of June 23, 2003, I arrived at the Old Executive Office Building to interview Mr. Libby, who was known to be an avid consumer of prewar intelligence assessments, which were already coming under fierce criticism. The first entry in my reporter's notebook from this interview neatly captured the question foremost in my mind.

"Was the intell slanted?" I wrote, referring to the intelligence assessments of Iraq and underlining the word "slanted."

I recall that Mr. Libby was displeased with what he described as "selective leaking" by the C.I.A. He told me that the agency was engaged in a "hedging strategy" to protect itself in case no weapons were found in Iraq. "If we find it, fine, if not, we hedged," is how he described the strategy, my notes show.

I recall that Mr. Libby was angry about reports suggesting that senior administration officials, including Mr. Cheney, had embraced skimpy intelligence about Iraq's alleged efforts to buy uranium in Africa while ignoring evidence to the contrary. Such reports, he said, according to my notes, were "highly distorted."

Mr. Libby said the vice president's office had indeed pressed the Pentagon and the State Department for more information about reports that Iraq had renewed efforts to buy uranium. And Mr. Cheney, he said, had asked about the potential ramifications of such a purchase. But he added that the C.I.A. "took it upon itself to try and figure out more" by sending a "clandestine guy" to Niger to investigate. I told Mr. Fitzgerald that I thought "clandestine guy" was a reference to Mr. Wilson -- Mr. Libby's first reference to him in my notes.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In May and in early June, Nicholas D. Kristof, a columnist at The Times, wrote of Mr. Wilson's trip to Niger without naming him. Mr. Kristof wrote that Mr. Wilson had been sent to Niger "at the behest" of Mr. Cheney's office.

My notes indicate that Mr. Libby took issue with the suggestion that his boss had had anything to do with Mr. Wilson's trip. "Veep didn't know of Joe Wilson," I wrote, referring to the vice president. "Veep never knew what he did or what was said. Agency did not report to us."

Soon afterward Mr. Libby raised the subject of Mr. Wilson's wife for the first time. I wrote in my notes, inside parentheses, "Wife works in bureau?" I told Mr. Fitzgerald that I believed this was the first time I had been told that Mr. Wilson's wife might work for the C.I.A. The prosecutor asked me whether the word "bureau" might not mean the Federal Bureau of Investigation. Yes, I told him, normally. But Mr. Libby had been discussing the C.I.A., and therefore my impression was that he had been speaking about a particular bureau within the agency that dealt with the spread of nuclear, biological and chemical weapons. As to the question mark, I said I wasn't sure what it meant. Maybe it meant I found the statement interesting. Maybe Mr. Libby was not certain whether Mr. Wilson's wife actually worked there.

What was evident, I told the grand jury, was Mr. Libby's anger that Mr. Bush might have made inaccurate statements because the C.I.A. failed to share doubts about the Iraq intelligence.

"No briefer came in and said, 'You got it wrong, Mr. President,'" he said, according to my notes.

The Second Libby Meeting

I interviewed Mr. Libby for a second time on July 8, two days after Mr. Wilson published his essay attacking the administration on the Op-Ed Page of The Times.

Our meeting, which lasted about two hours, took place over breakfast at the St. Regis Hotel in Washington. I told Mr. Fitzgerald that I almost certainly began this interview by asking about Mr. Wilson's essay, which appeared to have agitated Mr. Libby. As I recall, Mr. Libby asserted that the essay was inaccurate.

Mr. Fitzgerald asked about a notation I made on the first page of my notes about this July 8 meeting, "Former Hill staffer."

My recollection, I told him, was that Mr. Libby wanted to modify our prior understanding that I would attribute information from him to a "senior administration official." When the subject turned to Mr. Wilson, Mr. Libby requested that he be identified only as a "former Hill staffer." I agreed to the new ground rules because I knew that Mr. Libby had once worked on Capitol Hill.

Did Mr. Libby explain this request? Mr. Fitzgerald asked. No, I don't recall, I replied. But I said I assumed Mr. Libby did not want the White House to be seen as attacking Mr. Wilson.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Mr. Libby then proceeded through a lengthy and sharp critique of Mr. Wilson and
what Mr. Libby viewed as the C.I.A.'s backpedaling on the intelligence leading to
war. According to my notes, he began with a chronology of what he described as
credible evidence of Iraq's efforts to procure uranium. As I told Mr. Fitzgerald
and the grand jury, Mr. Libby alluded to the existence of two intelligence reports
about Iraq's uranium procurement efforts. One report dated from February 2002. The
other indicated that Iraq was seeking a broad trade relationship with Niger in
1999, a relationship that he said Niger officials had interpreted as an effort by
Iraq to obtain uranium.

My notes indicate that Mr. Libby told me the report on the 1999 delegation had
been attributed to Joe Wilson.

Mr. Libby also told me that on the basis of these two reports and other
intelligence, his office had asked the C.I.A. for more analysis and investigation
of Iraq's dealings with Niger. According to my interview notes, Mr. Libby told me
that the resulting cable -- based on Mr. Wilson's fact-finding mission, as it
turned out -- barely made it out of the bowels of the C.I.A. He asserted that
George J. Tenet, then the director of central intelligence, had never even heard
of Mr. Wilson.

As I told Mr. Fitzgerald, Mr. Libby also cited a National Intelligence Estimate on
Iraq, produced by American intelligence agencies in October 2002, which he said
had firmly concluded that Iraq was seeking uranium.

An unclassified version of that estimate had been made public before my interviews
with Mr. Libby. I told Mr. Fitzgerald that I had pressed Mr. Libby to discuss
additional information that was in the more detailed, classified version of the
estimate. I said I had told Mr. Libby that if The Times was going to do an
article, the newspaper needed more than a recap of the administration's weapons
arguments. According to my interview notes, though, it appears that Mr. Libby said
little more than that the assessments of the classified estimate were even
stronger than those in the unclassified version.

Although I was interested primarily in my area of expertise -- chemical and
biological weapons -- my notes show that Mr. Libby consistently steered our
conversation back to the administration's nuclear claims. His main theme echoed
that of other senior officials: that contrary to Mr. Wilson's criticism, the
administration had had ample reason to be concerned about Iraq's nuclear
capabilities based on the regime's history of weapons development, its use of
unconventional weapons and fresh intelligence reports.

At that breakfast meeting, our conversation also turned to Mr. Wilson's wife. My
notes contain a phrase inside parentheses: "Wife works at Winpac." Mr. Fitzgerald
asked what that meant. Winpac stood for Weapons Intelligence, Non-Proliferation,
and Arms Control, the name of a unit within the C.I.A. that, among other things,
analyzes the spread of unconventional weapons.

I said I couldn't be certain whether I had known Ms. Plame's identity before this
meeting, and I had no clear memory of the context of our conversation that
resulted in this notation. But I told the grand jury that I believed that this was
the first time I had heard that Mr. Wilson's wife worked for Winpac. In fact, I

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10/16/05 NYT 131                                                        Page 6

told the grand jury that when Mr. Libby indicated that Ms. Plame worked for
Winpac, I assumed that she worked as an analyst, not as an undercover operative.

Mr. Fitzgerald asked me whether Mr. Libby had mentioned nepotism. I said no. And
as I told the grand jury, I did not recall -- and my interview notes do not show
-- that Mr. Libby suggested that Ms. Plame had helped arrange her husband's trip
to Niger. My notes do suggest that our conversation about Ms. Plame was brief.

Mr. Fitzgerald asked me about another entry in my notebook, where I had written
the words "Valerie Flame," clearly a reference to Ms. Plame. Mr. Fitzgerald wanted
to know whether the entry was based on my conversations with Mr. Libby. I said I
didn't think so. I said I believed the information came from another source, whom
I could not recall.

Mr. Fitzgerald asked if I could recall discussing the Wilson-Plame connection with
other sources. I said I had, though I could not recall any by name or when those
conversations occurred.

Before the grand jury, Mr. Fitzgerald asked me questions about Mr. Cheney. He
asked, for example, if Mr. Libby ever indicated whether Mr. Cheney had approved of
his interviews with me or was aware of them. The answer was no.

In my grand jury testimony, Mr. Fitzgerald repeatedly turned to the subject of how
Mr. Libby handled classified information with me. He asked, for example, whether I
had discussed my security status with Mr. Libby. During the Iraq war, the Pentagon
had given me clearance to see secret information as part of my assignment
"embedded" with a special military unit hunting for unconventional weapons.

Mr. Fitzgerald asked if I had discussed classified information with Mr. Libby. I
said I believed so, but could not be sure. He asked how Mr. Libby treated
classified information. I said, Very carefully.

Mr. Fitzgerald asked me to examine a series of documents. Though I could not
identify them with certainty, I said that some seemed familiar, and that they
might be excerpts from the National Intelligence Estimate of Iraq's weapons. Mr.
Fitzgerald asked whether Mr. Libby had shown any of the documents to me. I said
no, I didn't think so. I thought I remembered him at one point reading from a
piece of paper he pulled from his pocket.

I told Mr. Fitzgerald that Mr. Libby might have thought I still had security
clearance, given my special embedded status in Iraq. At the same time, I told the
grand jury I thought that at our July 8 meeting I might have expressed frustration
to Mr. Libby that I was not permitted to discuss with editors some of the more
sensitive information about Iraq.

Mr. Fitzgerald asked me if I knew whether I was cleared to discuss classified
information at the time of my meetings with Mr. Libby. I said I did not know.

The Third Libby Conversation


My third interview with Mr. Libby occurred on July 12, two days before Robert D.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10/16/05 NYT 131                                                        Page 7

Novak's column identified Ms. Plame for the first time as a C.I.A. operative. I
believe I spoke to Mr. Libby by telephone from my home in Sag Harbor, N.Y.

I told Mr. Fitzgerald I believed that before this call, I might have called others
about Mr. Wilson's wife. In my notebook I had written the words "Victoria Wilson"
with a box around it, another apparent reference to Ms. Plame, who is also known
as Valerie Wilson.

I told Mr. Fitzgerald that I was not sure whether Mr. Libby had used this name or
whether I just made a mistake in writing it on my own. Another possibility, I
said, is that I gave Mr. Libby the wrong name on purpose to see whether he would
correct me and confirm her identity.

I also told the grand jury I thought it was odd that I had written "Wilson"
because my memory is that I had heard her referred to only as Plame. Mr.
Fitzgerald asked whether this suggested that Mr. Libby had given me the name
Wilson. I told him I didn't know and didn't want to guess.

My notes of this phone call show that Mr. Libby quickly turned to criticizing Mr.
Wilson's report on his mission to Niger. He said it was unclear whether Mr. Wilson
had spoken with any Niger officials who had dealt with Iraq's trade
representatives.

With the understanding that I would attribute the information to an administration
official, Mr. Libby also sought to explain why Mr. Bush included the disputed
uranium allegation in his 2003 State of the Union address, a sentence of 16 words
that his administration would later retract. Mr. Libby described it as the product
of a simple miscommunication between the White House and the C.I.A.

Mr. Fitzgerald asked whether I ever pursued an article about Mr. Wilson and his
wife. I told him I had not, though I considered her connection to the C.I.A.
potentially newsworthy. I testified that I recalled recommending to editors that
we pursue a story.

Mr. Fitzgerald asked my reaction to Mr. Novak's column. I told the grand jury I
was annoyed at having been beaten on a story. I said I felt that since The Times
had run Mr. Wilson's original essay, it had an obligation to explore any
allegation that undercut his credibility. At the same time, I added, I also
believed that the newspaper needed to pursue the possibility that the White House
was unfairly attacking a critic of the administration.

Mr. Libby's Letter

When I was last before the grand jury, Mr. Fitzgerald posed a series of questions
about a letter I received in jail last month from Mr. Libby. The letter, two pages
long, encouraged me to testify. "Your reporting, and you, are missed," it begins.

Mr. Fitzgerald asked me to read the final three paragraphs aloud to the grand
jury. "The public report of every other reporter's testimony makes clear that they
did not discuss Ms. Plame's name or identity with me," Mr. Libby wrote.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10/16/05 NYT 131                                                    Page 8

The prosecutor asked my reaction to those words. I replied that this portion of
the letter had surprised me because it might be perceived as an effort by Mr.
Libby to suggest that I, too, would say we had not discussed Ms. Plame's identity.
Yet my notes suggested that we had discussed her job.

Mr. Fitzgerald also focused on the letter's closing lines. "Out West, where you
vacation, the aspens will already be turning," Mr. Libby wrote. "They turn in
clusters, because their roots connect them."

How did I interpret that? Mr. Fitzgerald asked.

In answer, I told the grand jury about my last encounter with Mr. Libby. It came
in August 2003, shortly after I attended a conference on national security issues
held in Aspen, Colo. After the conference, I traveled to Jackson Hole, Wyo. At a
rodeo one afternoon, a man in jeans, a cowboy hat and sunglasses approached me. He
asked me how the Aspen conference had gone. I had no idea who he was.

"Judy," he said. "It's Scooter Libby."

Photo: BREAKING A SILENCE -- Judith Miller speaking to reporters on Sept. 30 after
her first testimony before a grand jury investigating the leak of C.I.A.
information. (Photo by Luke Frazza/Agence France-Presse -- Getty Images)

                    ---- INDEX REFERENCES ----

INDUSTRY:  (TV (1TV19); TV Programming Syndication & Distribution (1TV80);
Entertainment (1EN08); TV Marketing & Promotion (1TV57); Security (1SE29))

REGION:  (Middle East (1MI23); Gulf States (1GU47); Africa (1AF90); USA (1US73);
Americas (1AM92); Niger (1NI25); West Africa (1WE48); Colorado (1CO26); North
America (1NO39); Iraq (1IR87); Arab States (1AR46))

Language:  EN

OTHER INDEXING:  (AGENCY; CENTRAL INTELLIGENCE AGENCY; FEDERAL BUREAU OF
INVESTIGATION; FEDERAL GRAND JURY; HILL; IV; JUDY; NATIONAL INTELLIGENCE ESTIMATE;
PENTAGON; STATE DEPARTMENT; WEAPONS INTELLIGENCE; WHITE HOUSE; WINPAC)  (Bush;
Cheney; Dick Cheney; Equally; Fitzgerald; George J. Tenet; I. Lewis Libby; Jackson
Hole; Kristof; Libby; Luke Frazza; Nicholas D. Kristof; Novak; Patrick J.
Fitzgerald; Photo; Plame; President; Robert D. Novak; Saddam Hussein; Scooter
Libby; Valerie; Valerie Flame; Valerie Wilson; Veep; Wilson)

EDITION: Late Edition - Final

Word Count: 4147
10/16/05 NYT 131
END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

Westlaw.                                           The New York Times

10/16/05 NYT 11                                                    Page 1

10/16/05 N.Y. Times 11
2005 WLNR 16751237

New York Times (NY)
Copyright (c) 2005 The New York Times. All rights reserved.

October 16, 2005

Section: 1

The Miller Case: **A Notebook**, **A Cause**, a Jail Cell and a Deal

This article is by Don Van Natta Jr., Adam Liptak and Clifford J. Levy.; Janny Scott con-
tributed reporting for this article.

In a notebook belonging to Judith Miller, a reporter for The New York Times, amid nota-
tions about Iraq and nuclear weapons, appear two small words: "Valerie Flame."

Ms. Miller should have written Valerie Plame. That name is at the core of a federal grand
jury investigation that has reached deep into the White House. At issue is whether Bush
administration officials leaked the identity of Ms. Plame, an undercover C.I.A. operative,
to reporters as part of an effort to blunt criticism of the president's justification for
the war in Iraq.

Ms. Miller spent 85 days in jail for refusing to testify and reveal her confidential
source, then relented. On Sept. 30, she told the grand jury that her source was I. Lewis
Libby, the vice president's chief of staff. But she said he did not reveal Ms. Plame's
name.

And when the prosecutor in the case asked her to explain how "Valerie Flame" appeared in
the same notebook she used in interviewing Mr. Libby, Ms. Miller said she "didn't think"
she heard it from him. "I said I believed the information came from another source, whom I
could not recall," she wrote on Friday, recounting her testimony for an article that ap-
pears today.

Whether Ms. Miller's testimony will prove valuable to the prosecution remains unclear, as
do its ramifications for press freedom. Yet an examination of Ms. Miller's decision not to
testify, and then to do so, offers fresh information about her role in the investigation
and how The New York Times turned her case into a cause.

The grand jury investigation centers on whether administration officials leaked the iden-
tity of Ms. Plame, whose husband, a former diplomat named Joseph C. Wilson IV, became a
public critic of the Iraq war in July 2003. But Ms. Miller said Mr. Libby first raised
questions about the diplomat in an interview with her that June, an account suggesting
that Mr. Wilson was on the White House's radar before he went public with his criticisms.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The New York Times

Once Ms. Miller was issued a subpoena in August 2004 to testify about her conversations with Mr. Libby, she and The Times vowed to fight it. Behind the scenes, however, her lawyer made inquiries to see if Mr. Libby would release her from their confidentiality agreement. Ms. Miller said she decided not to testify in part because she thought that Mr. Libby's lawyer might be signaling to keep her quiet unless she would exonerate his client. The lawyer denies that, and Mr. Libby did not respond to requests for an interview.

As Ms. Miller, 57, remained resolute and moved closer to going to jail for her silence, the leadership of The Times stood squarely behind her.

"She'd given her pledge of confidentiality," said Arthur Sulzberger Jr., the publisher. "She was prepared to honor that. We were going to support her."

But Mr. Sulzberger and the paper's executive editor, Bill Keller, knew few details about Ms. Miller's conversations with her confidential source other than his name. They did not review Ms. Miller's notes. Mr. Keller said he learned about the "Valerie Flame" notation only this month. Mr. Sulzberger was told about it by Times reporters on Thursday.

Interviews show that the paper's leaders, in taking what they considered to be a principled stand, ultimately left the major decisions in the case up to Ms. Miller, an intrepid reporter whom editors found hard to control.

"This car had her hand on the wheel because she was the one at risk," Mr. Sulzberger said.

Once Ms. Miller was jailed, her lawyers were in open conflict about whether she should stay there. She had refused to reopen communications with Mr. Libby for a year, saying she did not want to pressure a source into waiving confidentiality. But in the end, saying "I owed it to myself" after two months of jail, she had her lawyer reach out to Mr. Libby. This time, hearing directly from her source, she accepted his permission and was set free.

"We have everything to be proud of and nothing to apologize for," Ms. Miller said in an interview Friday.

Neither The Times nor its cause has emerged unbruised. Three courts, including the Supreme Court, declined to back Ms. Miller. Critics said The Times was protecting not a whistleblower but an administration campaign intended to squelch dissent. The Times's coverage of itself was under assault: While the editorial page had crusaded on Ms. Miller's behalf, the news department had more than once been scooped on the paper's own story, even including the news of Ms. Miller's release from jail.

Asked what she regretted about The Times's handling of the matter, Jill Abramson, a managing editor, said: "The entire thing."

A Divisive Newsroom Figure

In the spring of 2003, Ms. Miller returned from covering the war in Iraq, where she had

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

The New York Times

been embedded with an American military team searching unsuccessfully for evidence of nuclear, chemical and biological weapons. Back in the States, another battle was brewing.

Ms. Miller had written a string of articles before the war -- often based on the accounts of Bush administration officials and Iraqi defectors -- strongly suggesting that Saddam Hussein was developing these weapons of mass destruction.

When no evidence of them was found, her reporting, along with that of some other journalists, came under fire. She was accused of writing articles that helped the Bush administration make its case for war.

"I told her there was unease, discomfort, unhappiness over some of the coverage," said Roger Cohen, who was the foreign editor at the time. "There was concern that she'd been convinced in an unwarranted way, a way that was not holding up, of the possible existence of W.M.D."

It was a blow to the reputation of Ms. Miller, an investigative reporter who has worked at The Times for three decades. Ms. Miller is known for her expertise in intelligence and security issues and her ability to cultivate relationships with influential sources in government. In 2002, she was part of a team of Times reporters that won a Pulitzer Prize for articles on Al Qaeda.

Inside the newsroom, she was a divisive figure. A few colleagues refused to work with her.

"Judy is a very intelligent, very pushy reporter," said Stephen Engelberg, who was Ms. Miller's editor at The Times for six years and is now a managing editor at The Oregonian in Portland. "Like a lot of investigative reporters, Judy benefits from having an editor who's very interested and involved with what she's doing."

In the year after Mr. Engelberg left the paper in 2002, though, Ms. Miller operated with a degree of autonomy rare at The Times.

Douglas Frantz, who succeeded Mr. Engelberg as the investigative editor, said that Ms. Miller once called herself "Miss Run Amok."

"I said, 'What does that mean?'" said Mr. Frantz, who was recently appointed managing editor at The Los Angeles Times. "And she said, 'I can do whatever I want.'"

Ms. Miller said she remembered the remark only vaguely but must have meant it as a joke, adding, "I have strong elbows, but I'm not a dope."

Ms. Miller said she was proud of her journalism career, including her work on Al Qaeda, biological warfare and Islamic militancy. But she acknowledged serious flaws in her articles on Iraqi weapons.

"W.M.D. -- I got it totally wrong," she said. "The analysts, the experts and the journalists who covered them -- we were all wrong. If your sources are wrong, you are wrong. I

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The New York Times

did the best job that I could."

In two interviews, Ms. Miller generally would not discuss her interactions with editors, elaborate on the written account of her grand jury testimony or allow reporters to review her notes.

On July 30, 2003, Mr. Keller became executive editor after his predecessor, Howell Raines, was dismissed after a fabrication scandal involving a young reporter named Jayson Blair.

Within a few weeks, in one of his first personnel moves, Mr. Keller told Ms. Miller that she could no longer cover Iraq and weapons issues. Even so, Mr. Keller said, "she kept kind of drifting on her own back into the national security realm."

Although criticism of Ms. Miller's Iraq coverage mounted, Mr. Keller waited until May 26, 2004, to publish an editors' note that criticized some of the paper's coverage of the run-up to the war.

The note said the paper's articles on unconventional weapons were credulous. It did not name any reporters and said the failures were institutional. Five of the six articles called into question were written or co-written by Ms. Miller.

'A Good-Faith Source'

On June 23, 2003, Ms. Miller visited Mr. Libby at the Old Executive Office Building in Washington. Mr. Libby was the vice president's top aide and had played an important role in shaping the argument for going to war in Iraq. He was "a good-faith source who was usually straight with me," Ms. Miller said in an interview.

Her assignment was to write an article about the failure to find unconventional weapons in Iraq. She said Mr. Libby wanted to talk about a diplomat's fact-finding trip in 2002 to the African nation of Niger to determine whether Iraq sought uranium there. The diplomat was Mr. Wilson, and his wife worked for the C.I.A.

Mr. Wilson had already become known among Washington insiders as a fierce Bush critic. He would go public the next month, accusing the White House in an opinion article in The Times of twisting intelligence to exaggerate the Iraqi threat.

But Mr. Libby was already defending Vice President Dick Cheney, saying his boss knew nothing about Mr. Wilson or his findings. Ms. Miller said her notes leave open the possibility that Mr. Libby told her Mr. Wilson's wife might work at the agency.

On July 8, two days after Mr. Wilson's article appeared in The Times, the reporter and her source met again, for breakfast at the St. Regis Hotel, near the White House.

The notebook Ms. Miller used that day includes the reference to "Valerie Flame." But she said the name did not appear in the same portion of her notebook as the interview notes from Mr. Libby.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The New York Times

During the breakfast, Mr. Libby provided a detail about Ms. Wilson, saying she worked in a C.I.A. unit known as Winpac; the name stands for weapons intelligence, nonproliferation and arms control. Ms. Miller said she understood this to mean that Ms. Wilson was an analyst rather than an undercover operative.

Ms. Miller returned to the subject on July 12 in a phone call with Mr. Libby. Another variant on Valerie Wilson's name -- "Victoria Wilson" -- appears in the notes of that call. Ms. Miller had by then called other sources about Mr. Wilson's wife. In an interview, she would not discuss her sources.

Two days later, on July 14, Robert D. Novak, the syndicated columnist, wrote that Mr. Wilson's wife had suggested sending him to Niger, citing "two administration sources." He went on to say, without attributing the information, that Mr. Wilson's wife, "Valerie Plame, is an agency operative on weapons of mass destruction."

Ms. Miller's article on the hunt for missing weapons was published on July 20, 2003. It acknowledged that the hunt could turn out to be fruitless but focused largely on the obstacles the searchers faced.

Neither that article nor any in the following months by Ms. Miller discussed Mr. Wilson or his wife.

It is not clear why. Ms. Miller said in an interview that she "made a strong recommendation to my editor" that an article be pursued. "I was told no," she said. She would not identify the editor.

Ms. Abramson, the Washington bureau chief at the time, said Ms. Miller never made any such recommendation.

In the fall of 2003, after The Washington Post reported that "two top White House officials disclosed Plame's identity to at least six Washington journalists," Philip Taubman, Ms. Abramson's successor as Washington bureau chief, asked Ms. Miller and other Times reporters whether they were among the six. Ms. Miller denied it.

"The answer was generally no," Mr. Taubman said. Ms. Miller said the subject of Mr. Wilson and his wife had come up in casual conversation with government officials, Mr. Taubman said, but Ms. Miller said "she had not been at the receiving end of a concerted effort, a deliberate organized effort to put out information."

Enter a Special Prosecutor

The Novak column prompted a criminal investigation into whether government officials had violated a 1982 law that makes it a crime in some circumstances to disclose the identity of an undercover agent. At the end of December 2003, the United States attorney in Chicago, Patrick J. Fitzgerald, was appointed special prosecutor.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

The New York Times

10/16/05 NYT 11                                                    Page 6

Around the same time, F.B.I. investigators working for Mr. Fitzgerald asked officials in
the White House, including Mr. Libby, to sign waivers instructing reporters that they
could disregard earlier promises of confidentiality and reveal who their sources were.

When Ms. Miller was subpoenaed in the investigation in August 2004, The Times immediately
retained Floyd Abrams, who had often represented the paper and is a noted First Amendment
lawyer.

The Times said it believes that attempts by prosecutors to force reporters to reveal con-
fidential information must be resisted. Otherwise, it argues, the public would be deprived
of important information about the government and other powerful institutions.

The fact that Ms. Miller's judgment had been questioned in the past did not affect its
stance. "The default position in a case like that is you support the reporter," Mr. Keller
said.

It was in these early days that Mr. Keller and Mr. Sulzberger learned Mr. Libby's iden-
tity. Neither man asked Ms. Miller detailed questions about her conversations with him.

Both said they viewed the case as a matter of principle, which made the particulars less
important. "I didn't interrogate her about the details of the interview," Mr. Keller said.
"I didn't ask to see her notes. And I really didn't feel the need to do that."

Still, Mr. Keller said the case was not ideal: "I wish it had been a clear-cut whistle-
blower case. I wish it had been a reporter who came with less public baggage."

Times lawyers warned company executives that they would have trouble persuading a judge to
excuse Ms. Miller from testifying. The Supreme Court decided in 1972 that the First Amend-
ment offers reporters no protection from grand jury subpoenas.

Ms. Miller authorized Mr. Abrams to talk to Mr. Libby's lawyer, Joseph A. Tate. The ques-
tion was whether Mr. Libby really wanted her to testify. Mr. Abrams passed the details of
his conversation with Mr. Tate along to Ms. Miller and to Times executives and lawyers,
people involved in the internal discussion said.

People present at the meetings said that what they heard about the preliminary negoti-
ations was troubling.

Mr. Abrams told Ms. Miller and the group that Mr. Tate had said she was free to testify.
Mr. Abrams said Mr. Tate also passed along some information about Mr. Libby's grand jury
testimony: that he had not told Ms. Miller the name or undercover status of Mr. Wilson's
wife.

That raised a potential conflict for Ms. Miller. Did the references in her notes to "Valer-
ie Flame" and "Victoria Wilson" suggest that she would have to contradict Mr. Libby's ac-
count of their conversations? Ms. Miller said in an interview that she concluded that Mr.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Tate was sending her a message that Mr. Libby did not want her to testify.

According to Ms. Miller, this was what Mr. Abrams told her about his conversation with Mr. Tate: "He was pressing about what you would say. When I wouldn't give him an assurance that you would exonerate Libby, if you were to cooperate, he then immediately gave me this, 'Don't go there, or, we don't want you there.'"

Mr. Abrams said: "On more than one occasion, Mr. Tate asked me for a recitation of what Ms. Miller would say. I did not provide one."

In an e-mail message Friday, Mr. Tate called Ms. Miller's interpretation "outrageous."

"I never once suggested that she should not testify," Mr. Tate wrote. "It was just the opposite. I told Mr. Abrams that the waiver was voluntary."

He added: "'Don't go there' or 'We don't want you there' is not something I said, would say, or ever implied or suggested."

Telling another witness about grand jury testimony is lawful as long as it is not an attempt to influence the other witness's testimony.

"Judy believed Libby was afraid of her testimony," Mr. Keller said, noting that he did not know the basis for the fear. "She thought Libby had reason to be afraid of her testimony."

Ms. Miller and the paper decided at that point not to pursue additional negotiations with Mr. Tate.

The two sides did not talk for a year.

Ms. Miller said in an interview that she was waiting for Mr. Libby to call her, but he never did. "I interpreted the silence as, 'Don't testify,'" Ms. Miller said.

She and her lawyers have also said it was inappropriate for them to hound a source for permission to testify.

Mr. Tate, for his part, said the silence of the Miller side was mystifying.

"You never told me," Mr. Tate wrote to Mr. Abrams recently, "that your client did not accept my representation of voluntariness or that she wanted to speak personally to my client." Mr. Abrams does not dispute that.

Talks between Ms. Miller's lawyer and the prosecutor, Mr. Fitzgerald, were at a dead end, too.

Not long after breaking off communications with Mr. Tate, Mr. Abrams spoke to Mr. Fitzgerald twice in September 2004. Mr. Abrams wanted to narrow the scope of the questions Ms. Miller would be asked if she testified before the grand jury.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Mr. Abrams said he wanted Mr. Fitzgerald to question Ms. Miller only on her conversations with Mr. Libby about Ms. Wilson. And he wanted a promise that Mr. Fitzgerald would not call her back for further questioning after she testified once.

Mr. Fitzgerald said no. His spokesman declined to comment for this article.

With negotiations at an impasse, Ms. Miller and The Times turned to the courts but were rebuffed. In October 2004, Chief Judge Thomas F. Hogan of the Federal District Court in Washington held Ms. Miller in contempt for not testifying. She remained free while she pursued appeals.

A few weeks later on Capitol Hill, in November 2004, Ms. Miller bumped into Robert S. Bennett, the prominent Washington criminal lawyer who represented President Bill Clinton during the Monica Lewinsky scandal and who is known for his blunt style and deal-making skills.

Ms. Miller recalled Mr. Bennett saying while he signed on to her case: "I don't want to represent a principle. I want to represent Judy Miller."

After the Supreme Court declined to hear the case, Ms. Miller made a final plea to Judge Hogan to stay out of jail: "My motive here is straightforward. A promise of confidentiality once made must be respected, or the journalist will lose all credibility and the public will, in the end, suffer."

Judge Hogan ordered her jailed at Alexandria Detention Center in Northern Virginia until she agreed to testify or the grand jury's term expired on Oct. 28.

"She has the keys to release herself," the judge said. "She has a waiver she chooses not to recognize."

Rising Tensions at Newspaper

While the paper's leaders were rallying around Ms. Miller's cause in public, inside The Times tensions were growing.

Throughout this year, reporters at the paper spent weeks trying to determine the identity of Ms. Miller's source. All the while, Mr. Keller knew it, but declined to tell his own reporters.

Even after reporters learned it from outside sources, The Times did not publish Mr. Libby's name, though other news organizations already had. The Times did not tell its readers that Mr. Libby was Ms. Miller's source until Sept. 30, in an article about Ms. Miller's release from jail.

Mr. Keller said that before Ms. Miller went to jail, Mr. Sulzberger, the publisher, asked him to participate in meetings on legal strategy and public statements. Mr. Keller said he then turned over the supervision of the newspaper's coverage of the case to Ms. Abramson,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

though he said he did not entirely step aside.

"It was just too awkward," Mr. Keller said, "to have me coming from meetings where they were discussing the company's public posture, then overseeing stories that were trying to deal with the company's public posture."

Ms. Abramson called The Times's coverage of the case "constrained." She said that if Ms. Miller was willing to go to jail to protect her source, it would have been "unconscionable then to out her source in the pages of the paper."

Mr. Keller and Ms. Abramson said this created an almost impossible tension between covering the case and the principle they believed to be at the heart of it.

Some reporters said editors seemed reluctant to publish articles about other aspects of the case as well, like how it was being investigated by Mr. Fitzgerald. In July, Richard W. Stevenson and other reporters in the Washington bureau wrote an article about the role of Mr. Cheney's senior aides, including Mr. Libby, in the leak case. The article, which did not disclose that Mr. Libby was Ms. Miller's source, was not published.

Mr. Stevenson said he was told by his editors that the article did not break enough new ground. "It was taken pretty clearly among us as a signal that we were cutting too close to the bone, that we were getting into an area that could complicate Judy's situation," he said.

In August, Douglas Jehl and David Johnston, two other Washington reporters, sent a memo to the Washington bureau chief, Mr. Taubman, listing ideas for coverage of the case. Mr. Taubman said Mr. Keller did not want them pursued because of the risk of provoking Mr. Fitzgerald or exposing Mr. Libby while Ms. Miller was in jail.

Mr. Taubman said he felt bad for his reporters, but he added that he and other senior editors felt that they had no choice. "No editor wants to be in the position of keeping information out of the newspaper," Mr. Taubman said.

Both Mr. Taubman and Ms. Abramson called the situation "excruciatingly difficult."

One result was that other news organizations broke developments in the case before The Times. Reporters found it especially frustrating when on the day that Ms. Miller left jail, The Times had an article prepared at 2 p.m. but delayed posting it on its Web site until after the news appeared on the Web site of The Philadelphia Inquirer.

"We end up being late on our own story," Mr. Johnston said.

There were other awkward moments. On Oct. 7, shortly before Ms. Miller was to conduct a telephone interview with two Times reporters, George Freeman, a Times company lawyer, sent her a four-page memorandum.

Ms. Miller and her outside lawyer, Mr. Bennett, reacted furiously, calling it a "script"

The New York Times

and nearly canceling the interview. Mr. Freeman said later that he had prepared and sent what he called a "narrative" of what happened to Ms. Miller. Mr. Freeman said it had been written long before the interview with Ms. Miller had even been contemplated.

"It was not meant to be a script," Mr. Freeman said.

The editorial page, which is run by Mr. Sulzberger and Gail Collins, the editorial page editor, championed Ms. Miller's cause. The Times published more than 15 editorials and called for Congress to pass a shield law that would make it harder for federal prosecutors to compel reporters to testify.

Mr. Sulzberger said he did not personally write the editorials, but regularly urged Ms. Collins to devote space to them. After Ms. Miller was jailed, an editorial acknowledged that "this is far from an ideal case," before saying, "If Ms. Miller testifies, it may be immeasurably harder in the future to persuade a frightened government employee to talk about malfeasance in high places."

Asked in the interview whether he had any regrets about the editorials, given the outcome of the case, Mr. Sulzberger said no.

"I felt strongly that, one, Judy deserved the support of the paper in this cause -- and the editorial page is the right place for such support, not the news pages," Mr. Sulzberger said. "And secondly, that this issue of a federal shield law is really important to the nation."

Ms. Miller said the publisher's support was invaluable. "He galvanized the editors, the senior editorial staff," she said. "He metaphorically and literally put his arm around me."

More Thoughts of a Waiver

Inside her cell in the Alexandria Detention Center this summer, Ms. Miller was able to peer through a narrow concrete slit to get an obstructed view of a maple tree and a concrete highway barrier. She was losing weight and struggling to sleep on two thin mats on a concrete slab.

Although she told friends that she was feeling isolated and frustrated, Ms. Miller said she comforted herself with thousands of letters, the supportive editorials in The Times and frequent 30-minute visits from more than 100 friends and colleagues. Among them were Mr. Sulzberger; Tom Brokaw, the former anchor at NBC News; Richard A. Clarke, a former counterterrorism official; and John R. Bolton, the United States ambassador to the United Nations.

Every day, she checked outdated copies of The Times for a news article about her case. Most days she was disappointed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

The New York Times

She said she began thinking about whether she should reach out to Mr. Libby for "a personal, voluntary waiver."

"The longer I was there, the more chance I had to think about it," Ms. Miller said.

On July 20, William Safire, the former longtime columnist at The Times, testified about a federal shield law on Capitol Hill. Ms. Miller read his testimony and found it "inspiring."

While she mulled over her options, Mr. Bennett was urging her to allow him to approach Mr. Tate, Mr. Libby's lawyer, to try to negotiate a deal that would get her out of jail. Mr. Bennett wanted to revive the question of the waivers that Mr. Libby and other administration officials signed the previous year authorizing reporters to disclose their confidential discussions.

The other reporters subpoenaed in the case said such waivers were coerced. They said administration officials signed them only because they feared retribution from the prosecutor or the White House. Reporters for at least three news organizations had then gone back to their sources and obtained additional assurances that convinced them the waivers were genuine.

But Ms. Miller said she had not gotten an assurance that she felt would allow her to testify. And she said she felt that if Mr. Libby had wanted her to testify, he would have contacted her directly.

While Mr. Bennett urged Ms. Miller to test the waters, some of her other lawyers were counseling caution. Mr. Freeman, The Times's company lawyer, and Mr. Abrams worried that if Ms. Miller sought and received permission to testify and was released from jail, people would say that she and the newspaper had simply caved in.

"I was afraid that people would draw the wrong conclusions," Mr. Freeman said.

Mr. Freeman advised Ms. Miller to remain in jail until Oct. 28, when the term of the grand jury would expire and the investigation would presumably end.

Mr. Bennett thought that was a bad strategy; he argued that Mr. Fitzgerald would "almost certainly" empanel a new grand jury, which might mean Ms. Miller would have to spend an additional 18 months behind bars.

Mr. Freeman said he thought Mr. Fitzgerald was bluffing. Mr. Abrams was less sure. But he said Judge Hogan might release Ms. Miller if Mr. Fitzgerald tried to take further action against her.

"At that point," Ms. Miller said, "I realized if and when he did that, objectively things would change, and at that point, I might really be locked in."

After much deliberation, Ms. Miller said, she finally told Mr. Bennett to call Mr. Libby's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

lawyer. After two months in jail, Ms. Miller said, "I owed it to myself to see whether or not Libby had had a change of heart, the special prosecutor had had a change of heart."

Mr. Bennett called Mr. Tate on Aug. 31. Mr. Tate told Mr. Bennett that Mr. Libby had given permission to Ms. Miller to testify a year earlier. "I called Tate and this guy could not have been clearer -- 'Bob, my client has given a waiver,'" Mr. Bennett said.

Mr. Fitzgerald wrote to Mr. Tate on Sept. 12, saying he was concerned that Ms. Miller was still in jail because of a "misunderstanding" between her and Mr. Libby.

Three days later, Ms. Miller heard from Mr. Libby.

In a folksy, conversational two-page letter dated Sept. 15, Mr. Libby assured Ms. Miller that he had wanted her to testify about their conversations all along. "I believed a year ago, as now, that testimony by all will benefit all," he wrote. And he noted that "the public report of every other reporter's testimony makes clear that they did not discuss Ms. Plame's name or identity with me."

When Ms. Miller testified before the grand jury, Mr. Fitzgerald asked her about the letter. She said she responded that it could be perceived as an effort by Mr. Libby "to suggest that I, too, would say that we had not discussed Ms. Plame's identity." But she added that "my notes suggested that we had discussed her job."

Ms. Miller, though, wanted more than Mr. Libby's letter to feel free to testify. She told her lawyers that she still needed to hear from Mr. Libby in person. When that could not be arranged, she settled for a 10-minute jailhouse conference call on Sept. 19 with Mr. Libby, while two of her lawyers and one of Mr. Libby's listened in.

Ms. Miller said she was persuaded. "I mean, it's like the tone of the voice," she said. "When he talked to me about how unhappy he was that I was in jail, that he hadn't fully understood that I might have been going to jail just to protect him. He had thought there were other people whom I had been protecting. And there was kind of like an expression of genuine concern and sorrow."

Ms. Miller said she then "cross-examined" Mr. Libby. "When I pushed him hard, I said: 'Do you really want me to testify? Are you sure you really want me to testify?' He said something like: 'Absolutely. Believe it. I mean it.'"

At 1 p.m. on Sept. 26, Ms. Miller convened her lawyers in the jailhouse law library. All the lawyers agreed that Mr. Libby had released Ms. Miller from the pledge of confidentiality.

The next day, Mr. Bennett called Mr. Fitzgerald. He informed the prosecutor that Ms. Miller had a voluntary, personal waiver and asked Mr. Fitzgerald to restrict his questions to her conversations with Mr. Libby.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The New York Times

Mr. Bennett, who by now had carefully reviewed Ms. Miller's extensive notes taken from two interviews with Mr. Libby, assured Mr. Fitzgerald that Ms. Miller had only one meaningful source. Mr. Fitzgerald agreed to limit his questions to Mr. Libby and the Wilson matter.

Claudia Payne, a Times editor and a close friend of Ms. Miller, said that once Ms. Miller realized that her jail term could be extended, "it changed things a great deal. She said, 'I don't want to spend my life in here.'"

Ms. Payne added, "Her paramount concern was how her actions would be viewed by her colleagues."

On Sept. 29, Ms. Miller was released from jail and whisked by Mr. Sulzberger and Mr. Keller to the Ritz-Carlton Georgetown for a massage, a manicure, a martini and a steak dinner. The next morning, she testified before the grand jury for three hours. Afterward, Ms. Miller declared that her ordeal was a victory for journalists and the public.

She testified before the grand jury for a second time on Wednesday about notes from her first meeting with Mr. Libby.

Last week, Mr. Sulzberger said it was impossible to know whether Ms. Miller could have struck a deal a year earlier, as at least four other journalists had done.

"Maybe a deal was possible earlier," Mr. Sulzberger said. "And maybe, in retrospect, looking back, you could say this was a moment you could have jumped on. If so, shame on us. I tend to think not."

A Puzzling Outcome

On Oct. 3, four days after Ms. Miller left jail, she returned to the headquarters of The New York Times on West 43rd Street.

Before entering the building, she called her friend Ms. Payne and asked her to come downstairs and escort her in. "She very felt frightened," Ms. Payne said. "She felt very vulnerable."

At a gathering in the newsroom, she made a speech claiming victories for press freedom. Her colleagues responded with restrained applause, seemingly as mystified by the outcome of her case as the public.

"You could see it in people's faces," Ms. Miller said later. "I'm a reporter. People were confused and perplexed, and I realized then that The Times and I hadn't done a very good job of making people understand what has been accomplished." In the days since, The Times has been consumed by discussions about how the newspaper handled the case, how Times journalists covered the news of their own paper -- and about Ms. Miller herself.

"Everyone admires our paper's willingness to stand behind us and our work, but most people I talk to have been troubled and puzzled by Judy's seeming ability to operate outside of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

conventional reportorial channels and managerial controls," said Todd S. Purdum, a Washington reporter for The Times. "Partly because of that, many people have worried about whether this was the proper fight to fight."

Diana B. Henriques, a business reporter, said she and others at the paper took "great pride and comfort" in how The Times stood by Ms. Miller. But she said the episode and speculation surrounding it "left a lot of people feeling confused and anxious" about Ms. Miller's role in the investigation.

On Tuesday, Ms. Miller is to receive a First Amendment award from the Society of Professional Journalists. She said she thought she would write a book about her experiences in the leak case, although she added that she did not yet have a book deal. She also plans on taking some time off but says she hopes to return to the newsroom.

She said she hopes to cover "the same thing I've always covered -- threats to our country."

The Times incurred millions of dollars in legal fees in Ms. Miller's case. It limited its own ability to cover aspects of one of the biggest scandals of the day. Even as the paper asked for the public's support, it was unable to answer its questions.

"It's too early to judge it, and it's probably for other people to judge," said Mr. Keller, the executive editor. "I hope that people will remember that this institution stood behind a reporter, and the principle, when it wasn't easy to do that, or popular to do that."

Timeline of a Leak

An interactive timeline of events in the investigation into the leak of the identity of an undercover C.I.A. operative: www.nytimes.com/washington.

Photos: THE AIDE -- I. Lewis Libby, Vice President Dick Cheney's chief of staff, testifying before a House committee in 2001. (Photo by Shawn Thew/Agence France-Presse -- Getty Images); THE DIPLOMAT -- Joseph C. Wilson IV on "Meet the Press" in 2004. He began criticizing the Iraq war in 2003. (Photo by NBC); THE PROSECUTOR -- Patrick J. Fitzgerald, United States attorney in Chicago, was assigned to the case in December 2003. (Photo by Doug Mills/The New York Times)(pg. 30)

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Legal (1LE33); United Nations (1UN54); World Organizations (1IN77); Judicial (1JU36))

INDUSTRY:  (I.T. (1IT96); Computer Equipment (1CO77); PC (1PC82))

REGION:  (Niger (1NI25); Americas (1AM92); North America (1NO39); Middle East (1MI23); USA (1US73); Africa (1AF90); Gulf States (1GU47); Illinois (1IL01); West Africa (1WE48); Iraq

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F

# Judith Miller .org



**Judith Miller is a former reporter for The New York Times and author of four books on the Middle East, biological weapons and the Holocaust. For information on her prosecution for refusing to reveal sources to federal prosecutors, see the** <u>news section</u> **of this Web site or the** <u>Reporters Committee for Freedom of the Press.</u>

**News**

**In this section:**

• <u>Reporting on mobile labs</u>

• <u>Memo on Italian award</u>

• <u>N.Y. Observer article on WMD</u>

• <u>Miller Presses for Shield Law, Gets Warm Ovation in Vegas</u>

• <u>Famed attorney calls for shield laws</u>

• <u>Judith Miller's Farewell</u>

• <u>Bill Keller's Letter to</u>

## Reporting on mobile labs

To those interested in pre-war WMD intelligence on Iraq, here are three stories that I wrote, or co-wrote, about the issue of Iraq's alleged mobile biological labs.

<u>**Aftereffects: The Hunt for Evidence**</u>, May 10, 2003

<u>**Aftereffects: Germ Weapons**</u>, May 21, 2003

<u>**Some Analysts Of Iraq Trailers Reject Germ Use**</u>, June 7, 2003

Each was an exclusive. The three together reflected my reporting on the ground in Iraq and in Washington as doubts among experts grew about the discovery of the trailers in Iraq. All three were published in The New York Times. I think they show that the answer to insufficient reporting, or a story that is wrong, is more reporting, preferably by the reporter who wrote the first story. I regret that in other instances, the Times did not permit me to report on the growing doubts about WMD intelligence in other areas as well.

Judy Miller

Posted by Joshua Tanzer | April 13, 2006

## Memo on Italian award

**Viareggio, Italy, Nov. 29, 2005**

Hello friends:

I have just returned from Italy where the Unione Nazionale Cronisti Italiani, UNCI, Italy's largest union representing some 2,000 news reporters and editors, honored me for helping to preserve a free press by spending 85 days in jail to protect the confidentiality of sources.

On Monday, I traveled to the beautiful seaside town of Viareggio, in Tuscany, to accept the tribute at UNCI's annual meeting, which was attended by almost 200 reporters and editors from throughout Italy. UNCI is Italy's the most important union for news reporters and editors in print, radio,

Destruction. But what did the delayed publication of the editor's note on that reporting have to do with the decision I made over a year later, which the paper fully supported, to protect our confidential sources? I remain proud of my decision to go to jail rather than reveal the identity of a source to whom I had pledged confidentiality, even if he happened to work for the Bush White House.

The Times asked me to assume a low profile in this controversy. I told everyone that I had no intention of airing internal editorial policy disputes and disagreements at the paper, as a matter of principle and loyalty to those who stood by me during this ordeal. Others have chosen a different path, ironically becoming "confidential sources" themselves.

You never bothered to mention in your essay my decision to spend 85 days in jail to honor the pledge I made. I'm saddened that you, like so many others, have blurred the core issue of that stand and I am stunned that you refused to post my answers to issues we had discussed on your web site at the critical moment that Times readers were forming their opinions.

Judith Miller

Posted by Judith Miller | November 09, 2005

# Responses to Byron Calame's Questions

To: Byron Calame
From: Judith Miller

Responses to your Questions:

Oct. 20, 2005

Why did I not cooperate fully with fellow reporters on stories about the Valerie Plame inquiry?

1) I cooperated fully with Don Van Natta's team for its story, despite being under considerable legal pressure not to do so. I spent over four hours talking to Don, first in a 90 minute on-the-record interview which my lawyer monitored because I was still under a contempt of court order. After the order was vacated, there were further on-the-record and background interviews which I gave while struggling on deadline to complete my own account of my grand jury testimony and writing testimony for the Senate Judiciary Committee which

had asked me to testify on the Federal shield law. I complied with all of the team's requests except for its demand for access to my notebooks. I declined to provide these not only because my lawyers objected, but because the paper told me I was being treated in this project not as a fellow Times reporter, but as any subject of a Times story would be. These notes were part of what I went to jail to protect, and I was not about to share them with anyone who was not authorized to see them.

Why did I keep drifting back into national security reporting after Bill Keller took me off the beat?

2) I was not a loose cannon or insubordinate, self-assigning reporter. The reason I kept I kept writing about Iraq and weapons after my embed in Iraq had ended was that I was assigned to cover the Oil for Food scandal, which involved both Iraq and unconventional weapons, and to cover counter-terrorism efforts in New York, which also involved both topics.

How did I find the second notebook?

3) I found the second notebook I testified about only after I was released from jail. During my grand jury testimony, there had been some confusion over whether redacted notes of an interview I had done with I. Lewis Libby and which I provided to the special prosecutor were taken on July 12 at my home in Sag Harbor or during a briefer discussion with Mr. Libby earlier in the week. Under oath, I had promised the special counsel I would search for any additional notes I might have relevant to Mr. Libby and my Plame/Wilson testimony. On my first evening back at the Times while I was on the phone with my lawyer, Bob Bennett, I came upon the notebook as I was looking through a shopping bag filled with notebooks that were kept under my computer at my desk. Though the notebook was too early to be covered by the subpoena, I discovered that it contained an interview in June with Mr. Libby. Deciphering my notes, I was astonished to see it showed that Mr. Libby and I had discussed Joe Wilson and his trip to Niger, as well as his wife, two weeks before Mr. Wilson had published his attack on the Administration in The Times. I told Bob Bennett what I had found, and he immediately informed the special prosecutor.

Was I telling the truth when I said I couldn't remember who first told me the name Valerie Plame?

4) As I told the grand jury under oath, I cannot remember who first told me the name of Joe Wilson's wife, or "Valerie Flame," another name which appears in my notebook. I cannot remember when or why I wrote that misspelled name in my notes. The name is free-floating, separated by two pages from

the end of an interview with Mr. Libby. It is not embedded in any other interview. I spoke to dozens of people when I returned from Iraq about a wide variety of WMD topics that I wrote about. I was not at all focused on the Wilson story and certainly had no idea that two years later Wilson's wife would be at the center of a major political scandal and grand jury investigation. I cannot specifically recall having discussed Mr. Wilson's wife with anyone other than Mr. Libby. No other sources on that subject are cited in my notes. But there were people with whom I discussed sensitive information for stories on other subjects that The Times did publish, and unless Mr. Fitzgerald had agreed to focus his questions to me on Mr. Libby and the Plame/Wilson affair, I could not have testified.

Why did you agree to change the attribution of Scooter Libby for a story?

5) I never did, and never would have identified Scooter Libby in print as a "former Hill staffer." Mr. Libby has never been identified in any story I have written as anything other than a "senior Administration official." While I was prepared to listen to what he had to say based on that attribution, I would have attempted to confirm the information he was providing through other sources, preferably on the record, or gone back to him to renegotiate a more appropriate attribution had I decided to write a story.

What was your assignment in Iraq and did you have access to secret information that was not shared with readers?

6) As part of my assignment with the soldiers who were hunting for weapons of mass destruction in Iraq, I regularly had access to secret information. As a condition of this assignment, like other reporters embedded in sensitive posts, I signed a non-disclosure agreement which gave the military authorization to screen copy I wrote to prevent the disclosure of sensitive sources and methods. Because senior officers of the Exploitation Task Force were so concerned that this sensitive information not be casually discussed in my newsroom, I assured them that I would limit discussions of the most sensitive intelligence sources and methods to senior news executives. Reporters like me remained bound by these commitments after their embeds ended. Unlike many other newspapers and reporters, the Times and I noted the existence of such agreements in stories whose publication had been delayed by military review.

Posted by Judith Miller | November 09, 2005

# Letter to Maureen Dowd